[Civ. No. 16901. First Dist., Div. Two. Sept. 17, 1956.]

WILLARD F. PETERSEN et al., Respondents, v. R. D. LANG et al., Appellants.

McFarland, Laumeister & Ferdon, and McFarland & Ferdon for Appellants.

Gardiner, Riede & Elliott and William T. Bagley for Respondents.

KAUFMAN, J.—Defendants appeal from a judgment rendered in favor of plaintiffs in the sum of $5,940, in an action brought to recover for services alleged to have been performed at the request of defendants and appellants in connection with the development of a supermarket in San Francisco. The action is based on counts II and IV of the first amended complaint, counts I and III having been dismissed on motion of plaintiffs.

Count II of the complaint alleged that appellants doing business as Lang Construction Company owned certain real property in San Francisco upon which there is presently constructed the "Alemany Super Market"; that appellants verbally employed respondents to prepare or assist in preparing a design for a commercial structure of the kind now existing on appellants' premises, and that they also then employed respondents to find and assist in getting tenants signed up on leases therefor. It was further alleged that respondent, Willard Petersen, was engaged in the business of selling marketing equipment to persons conducting food markets, and that in endeavoring to procure tenants for said super market, respondent with the knowledge and consent of appellants, R. D. Lang, Jr., and Boyd R. Lang, endeavored to procure contracts with said tenants for the fixture business; that he procured the tenants, Angelo and Vincent Nicolai, Vincent and Raymond Palmini and Roy Beckman who were willing to lease the entire premises. Respondent was unable, however, to secure a contract for the market equipment from these prospective tenants, and it is alleged, appellants were so informed. Respondents advised appellants that they could secure other tenants with whom they could negotiate a contract for such business. It is then alleged that appellants agreed that if respondents would consummate the lease with the above named prospective tenants and refrain from soliciting others, appellants would pay respondents a commission

for all of their services to be computed on the amount of profit respondent would otherwise have made if he had procured the fixture contract, and that such reasonable profit was $12,000; that respondents proceeded to consummate a lease with the aforementioned tenants, hence appellants are indebted to respondents in the sum of $12,000.

The fourth count of the amended complaint realleged the principal paragraphs of count II with the exception of the paragraph concerned with the special contract to refrain from soliciting other tenants and help conclude negotiations with the first five prospective tenants. It alleged that all of said services had been performed at the special instance and request of appellants, and were of the reasonable value of $12,000.

Respondent Willard Petersen had been in the business of promoting supermarkets since 1946. His usual procedure was to find a suitable location for such a market, then contact the owners of the property to find out if they would be willing to construct such market providing suitable tenants could be found. Respondent would then proceed to find such tenants, and would write fixture contracts with them. Leases would be executed between the tenants and the property owner. Respondents' compensation was always secured from profit on the fixture contracts with the tenants. Respondent Petersen, who also held a general contractor's license, would begin by drawing up floor plans for a market, showing thereon the space for each department and placement of fixtures.

The Lang brothers, appellants herein, were associated in the real estate business, and employed a salesman, Mr. Evans, who was a brother-in-law of respondent Petersen. Petersen also had office space at Lang Realty in San Francisco. He too held a real estate salesman's license under a San Anselmo broker, the other respondent herein, Columbus Pierce.

In 1951, while concerned with the promotion of the Cal-Mart, another supermarket in which the Langs were interested, the matter of developing the Alemany Supermarket was first discussed. Respondent saw each of the five prospective tenants who were later accepted, between 10 and 15 times, and two general meetings with the group were held at the Lang office. The group talks began with discussion of placement of fixtures, and led up to the matter of respondents' selling them. The plans which respondent prepared for the layout of fixtures was, he testified, the plan ultimately used by the tenants. Petersen was, however, unable to secure the

fixture contract from these tenants on a basis that would be satisfactory to him. It was the custom of fixture men in endeavoring to promote a deal, to prepare drawings of the premises showing the layout of fixtures. Petersen himself testified that the preparation of such drawings is customary with fixture men in the promotion of markets. Lang testified that it was common practice to work with fixture men in finding out about tenants, and that he contacted several to let them know that the market was available. Respondent stated that the placement and the type of fixtures in the completed market were with minor changes the same as recommended in his design. Lang admitted that Petersen had worked with him in the design and assisted in the drawing up of sketches, but claimed that respondent has done no more than some of the other fixture men.

Appellants had owned the Alemany property for about two years prior to 1951, and were anxious to get something developed on it. Respondent Petersen began looking for tenants in the summer of 1951. Lang admitted that he expected that Petersen and other fixture men to whom he gave the plan would be out looking for prospective tenants for him. Rudy Lang was aware of respondent's negotiations with the five prospective tenants and had given his approval.

Boyd Lang testified that one meeting of the prospective tenants was held in Petersen's office in the rear of the Lang Realty Company, that on this occasion Petersen and Baher, a partner of Petersen's, were present, as well as Jerry Evans, Lang's salesman. The terms of the lease were discussed at this meeting. Such a lease was ultimately entered into by these tenants.

Petersen testified that he first put Evans in touch with these tenants. He stated that Evans was to handle the real estate end of the deal, and respondent the fixture end when negotiations were first begun concerning the Cal-Mart. Evans was not very active, according to respondent, in connection with the Alemany deal. Three of the tenants of Cal-Mart were also three of the five tenants who signed the lease for the Alemany market. Petersen learned in the process of fixturizing the Cal-Mart that he could not get an exclusive right to fixturize a market, as the tenants would not stand for that sort of agreement.

After negotiating between this group of tenants and the appellants, respondent Petersen found that they were not going to buy their fixtures from him. He then told appellants

that he could get other tenants who would buy from him, and with whom he was negotiating for leases. Appellants, however, wished to keep the first group of tenants because of their sound financial position. Rudy Lang told respondent Petersen that "rather than lose them he felt that he would rather pay us." Lang wanted respondents to continue and not interfere with present negotiations, and that they would rather pay them the profit they would make on the fixtures than lose these tenants. He said he would pay them such profit if they would abstain from trying to get other tenants. One of appellants testified that this conversation did not occur but in his deposition stated that he didn't believe that there was such a conversation, but that it "could have happened." Petersen testified that he did cease other negotiations as requested which made it possible for them to consummate the lease, and that it was likely that the lease would not have been possible if respondents had not so acted, as appellants had had several possible tenants up to the point of signing who had "backed up."

Respondent Petersen testified that the minimum cost of fixturing on this market was $60,000, and that the normal profit expected by fixture men on such contracts is from 17 to 19 per cent.

The case was reopened for further testimony on the reasonable value of the services rendered, following a memorandum opinion by the trial judge indicating that a percentage of the real estate commission on such a lease would probably be a measure of reasonable value. Testimony was offered that such a commission would be in the sum of $5,940. The judgment in favor of respondents was entered for that sum.

 Appellants contend that the findings of the trial court are indefinite, inconsistent, fail to disclose the basis for the decision, and are not supported by the evidence. The contention has merit and finds support in the record as hereinafter pointed out.

Finding IV which finds all the allegations of paragraph XIII of the first amended complaint to be true is attacked as unsupported by the evidence. That paragraph of the complaint alleged that defendants verbally employed plaintiffs to prepare or assist in preparing a design for a market. Appellant is correct in stating that there is no evidence to support such a promise. There is evidence that respondent as well as others in this line of business were contacted to submit plans to appellants and were asked to contact prospec-

tive tenants. Respondent's own evidence, as well as that of other witnesses, is to the effect that men in the market fixture business customarily solicited prospective tenants for market owners in order to get the fixture business for themselves, and that they looked to the profit on such contracts with tenants for all of their compensation. Respondent Petersen himself testified that appellants had given him no guarantee that he had the exclusive right to select the future tenants. There was also evidence that Mr. Evans, a brother-in-law of Petersen, was the leasing agent for appellants. There is no evidence of *employment* of respondents in the preliminary stages of the market development. Respondents were assisting appellants to find tenants in order that respondents might profit by selling equipment to said tenants.

Finding V finds that respondents "prepared, or assisted in preparing leases." Respondent Petersen testified that Rudy Lang wanted him to continue and not to interfere with the negotiations with the five prospective tenants, that after that conversation he sat in on the next meeting with the prospective tenants "where some of the finer points were brought out on the building and the differences, what the tenants wanted and what the Langs needed, and from that time on we did nothing, we just dropped out of the picture." Viewing this testimony most favorably to the respondents it may be said that it is subject to the interpretation that they participated in preparations concerned with the terms of the lease. It is true that Petersen testified that he did not prepare the lease that was ultimately signed on November 20, 1950, but this could mean that he did not actually assist in the mechanical work of drafting it. It appears, therefore, that there is evidentiary support for the finding.

In finding VII, the trial court stated that defendants "would pay to said plaintiffs an amount equal to the reasonable value of said services." It was Petersen's testimony that appellants had promised him the profit that he would have made if he could have secured the fixture contract in return for his assistance in concluding the deal with the five tenants whom appellants desired instead of the new prospects suggested by him. Petersen's copartner, Baher, testified that Rudy Lang had pointed out the financial soundness of these tenants when Petersen had suggested the others with which he could do business. He reported that Lang said "don't lose them . . . and we will pay you the profit that you derive off of these fixtures, this fixture business." Baher also testified that

Petersen had three other prospective tenants from whom he was practically certain of getting the fixture business and that the sum of $60,000 for said fixtures was agreeable to one of them.

It is apparent from the findings that the trial judge believed that a promise to pay had been made to respondents for not upsetting the final signing up of these financially desirable tenants. It is clear that he disbelieved the testimony that the profit on a fixture contract was to be the measure of the compensation. There is, of course, no direct evidence in the record as to what price was agreed upon by appellants in return for respondents' favorable attitude toward the five tenants and their discontinuance of negotiations with others. There is certainly no direct evidence that they expressly agreed that appellants would pay respondents an "amount equal to the reasonable value of said services." Having found that the profit was not agreed upon as the measure of compensation, the court then goes on to find that "it is not true that the reasonable profit plaintiffs would have made, if they had procured such contracts for said fixture business . . . was or is in the amount of $12,000, but the same was or would have been equal to or in excess of $5,940." The only testimony supporting the sum of $5,940 is that such a sum would be a real estate salesman's commission on the lease which was executed by appellants and the five tenants. This sum is in no way related by the evidence herein to the profit on a possible fixture contract.

This finding apparently attempts to find that an express contract was entered into to pay respondents' compensation for assisting appellants in finally executing a lease with the highly prized prospective tenants, and for discontinuing solicitation of other prospects. It is, however, contradictory in certain respects and in other respects, as noted above, is unsupported by the evidence if it is to be interpreted as stating that there was an express agreement that reasonable value of the services was the measure of compensation.

■ If the findings on either the express contract or the implied contract are sufficient to support the judgment, the findings on the unsupported count may, of course, be disregarded. (*Baird* v. *Ocequeda*, 8 Cal.2d 700 [67 P.2d 1055].)

■ *But if the findings do not have sufficient clarity so that it is possible to determine what the theory of the trial court may have been, the judgment cannot stand.* (*Block* v. *D. W. Nicholson Corp.*, 77 Cal.App.2d 739 [176 P.2d 739] and see

*Andrews* v. *Cunningham,* 105 Cal.App.2d 525 [233 P.2d 563].)

Had the trial court found that the appellants requested respondents to assist in securing the lease with the five tenants offering to pay them, that the respondents accepted by cooperating in the securing of these tenants, and that the measure of compensation not having been agreed upon, the reasonable value thereof was impliedly promised, the finding would be supported. The sum of $5,940 could also be supported as the reasonable value, for if respondents' services in the final stages of negotiations were considered by appellants as indispensable to securing the execution of the lease, then it is not unreasonable to measure that service by the standard of a real estate commission.

Paragraph VIII of the findings states that all allegations of paragraph XVII of the complaint are true except that the reasonable value of the services is $5,940. That paragraph of the complaint alleged that the services rendered by plaintiffs "as hereinabove set forth and the aforementional oral agreement" were of the value of $12,000.

Finding IX finds all allegations of paragraph XXI of the complaint true except that the reasonable value was $5,940. This paragraph alleged that all of the services above were performed at the special instance and request of defendants. Paragraph XVI of the second count relating to the oral agreement discussed just above, was not realleged in this count.

The court finally found that Petersen first contacted the tenants who were accepted, that he first developed the market plans and first brought this program to the attention of defendants, that during the development of the plans and negotiations of leases, defendants promised they would pay plaintiffs the reasonable value of all of plaintiffs' said services if leases were consummated with the present tenants of Alemany Supermarket and if plaintiffs would refrain from soliciting other tenants from whom they anticipated a profit on the sale of fixtures; that as a result of such promises and discussions, leases were negotiated with the present tenants and plaintiffs complied with the requests and terms of defendants and actively assisted in procuring the present tenants; that defendants are unjustly enriched by the use of such services and equity requires that defendants pay to plaintiffs the reasonable value of such services.

Appellant contends that prior to the alleged oral undertaking of defendant Rudy Lang there was no obligation

either express or implied on the part of appellants. According to respondents' testimony the drafting of designs and layouts for placement of fixtures and the contacting of prospective tenants for market owners was customarily done by fixture men who looked to fixture contracts with such tenants for all of their compensation. Therefore, when as in the present case, no fixture man was given an exclusive right to choose tenants for a market owner, there was no obligation on the part of the market owner either contractual or moral, to compensate the fixture salesman for service which they were rendering primarily to promote contracts between themselves and the tenants.

Respondents maintain that the general rule that where services which are valuable are rendered by one to another and accepted, there is a presumption of an implied promise to pay the reasonable value thereof, citing *Fancher* v. *Brunger*, 94 Cal.App.2d 727 [211 P.2d 633], *Shepherd* v. *Perea*, 98 Cal.App.2d 518 [220 P.2d 776]; *Lazzarevich* v. *Lazzarevich*, 88 Cal.App.2d 708 [200 P.2d 49]; *Lloyd* v. *Kleefisch*, 48 Cal.App.2d 408 [120 P.2d 97]. None of the situations involved in those cases was similar to that herein, where the evidence is uncontradicted that both parties up to the point of the alleged oral agreement, assumed that any compensation for respondents' work would arise out of contracts which respondents hoped to make with a third party. The case of *Geisenhoff* v. *Mabrey*, 58 Cal.App.2d 481 [137 P.2d 36], is concerned with an implied promise to pay for promotional services, but in that case a written agreement which was unenforceable against some of defendants, showed the intention that plaintiff was to be paid for his services. The Restatement of Restitution, section 107, page 450, states that "In the case of services, the inference of a promise to pay may be rebutted . . . by the fact that such services when rendered under like circumstances customarily are given without compensation." It has been said that the question which must be determined in each case is "whether it can be reasonably inferred that pecuniary compensation was in the view of the parties at the time the services were rendered." (*Crane* v. *Derrick*, 157 Cal. 667 [109 P. 31]; and, see, *Gjurich* v. *Fieg*, 164 Cal. 429 [129 P. 464, Ann.Cas. 1916B 111]; *Eklund* v. *Eklund*, 76 Cal.App.2d 389 [173 P.2d 50].)

In regard to the alleged oral contract requiring respondents to assist in the final negotiations with the five tenants and desist from soliciting others, appellant argues that there was

no intention that the parties enter into an express contract. The evidence discussed above discloses sufficient intention to enter into an express contract. There is testimony from which it can be inferred that appellants believed respondents' influence was an important factor in closing the deal with these tenants, and this would be sufficient consideration to support their promise to pay respondents.

It is urged by appellants that if the language attributed to appellant Rudy Lang may be construed as an express undertaking, it was likewise for an express consideration binding upon respondents. That express consideration, they say, was the profit respondents would have made from a contract with the five tenants first contacted by them, and respondent Petersen testified that respondents could not make any money out of a contract with these tenants, and did not even bid on the contract. The testimony, while somewhat ambiguous, seems subject to the interpretation that appellants would pay the profit respondents would have received if they could have substituted other tenants with whom they could do business. However, the trial court's findings show that the court did not believe respondents' testimony that the payment was to be measured by profit on any contract. ██ It is true that if there is a valid express contract, recovery must be measured by its terms. (*Thacker* v. *American Foundry,* 78 Cal.App.2d 76 [177 P.2d 322].) But here although one of the respondents testified that such profit was the measure of payment, the court did not believe him. The trial court evidently believed respondents' testimony that appellants expressly agreed to pay in return for the requests made of respondents. It is said in 12 California Jurisprudence 2d 395 that where work is done under an express contract which does not specify the compensation to be paid, the law implies a promise to pay the reasonable value of the service. (And see *Carney* v. *Hayter,* 64 Cal.App.2d 792 [145 P.2d 712] ; *Elconin* v. *Yalen,* 208 Cal. 546, 549 [282 P. 791].)

In finding VIII, the court found that plaintiffs' performance of services was made pursuant to the oral agreement referred to in the preceding paragraph of the findings, and that by reason of these services rendered pursuant to such agreement defendants became indebted to plaintiffs in the sum of $5,940, the reasonable value of said services. If paragraph VII of the findings could be construed to mean that the appellants promised to pay respondents for said services, and therefore the reasonable value is implied, those findings would then

appear to be sufficient to support the judgment in the amount of $5,940. The subsequent findings on the common count in the fourth cause of action base this same amount on the value of services rendered by respondents in first contacting these tenants, and drawing designs, etc., with no reference to the alleged oral contract, and as noted earlier herein, all such services, apart from the contract alleged in paragraph XVI of the complaint, were rendered without expectation of compensation from appellants.

Respondents cite section 1606 of the Civil Code to the effect that "a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also good consideration for a promise, to an extent corresponding to the extent of the obligation . . ." They point out that appellants had a moral, if not a legal, obligation to respondents for the promotion services rendered when they learned that respondents would not be compensated through securing contracts with these tenants. This moral obligation, they argue, was sufficient consideration to support the oral agreement for payment by appellants. The above section of the Civil Code has been construed in *In re McConnells' Estate,* 6 Cal.2d 493 [58 P.2d 639], to mean that "a moral obligation is sufficient to support an express promise, where a good and valuable consideration has once existed." (And see *Foltz* v. *First Trust & Sav. Bank,* 86 Cal.App.2d 59 [194 P.2d 135].) However, the express agreement alleged to have been made herein does not necessarily depend upon past services for its consideration. There is evidence that appellants placed great value on respondents' future conduct in regard to the desirable tenants, and that respondents followed the course for which appellants bargained.

In view of the uncertainties and apparent conflicts in essential findings, the judgment must be reversed.

Judgment reversed.

Nourse, P. J., and Draper, J. pro tem.,* concurred.

A petition for a rehearing was denied October 17, 1956.

---

*Assigned by Chairman of Judicial Council.