[Civ. No. 18618.   First Dist., Div. One.   July 28, 1960.]

NICK JOZOVICH, Respondent, v. CENTRAL CALI-
FORNIA BERRY GROWERS ASSOCIATION (a Cor-
poration), Appellant.

Francis Kerner and Wilkie C. Courter for Appellant.

Timothy A. O'Connor for Respondent.

TOBRINER, J.—Respondent here guaranteed to produce a machine under a contract which provided for an intermediate payment on April 1st and a later final payment on May 1st under certain conditions. Appellant failed to make the April 1st payment; respondent nevertheless, continued to work on the machine. Our principal question turns on whether the trial court's judgment for the intermediate installment can be sustained despite respondent's continued attempted performance and his ultimate failure. Because the contract provided for the guaranteed production of a single entity, a functioning machine, we do not believe the intermediate payment constituted a severable, divisible obligation, and we hold that recovery of that installment, after the date of final payment, must be conditioned upon the expected and guaranteed performance. Nor can respondent successfully contend that he was prevented from fulfilling the contract by appellant's refusal to permit him to work after June 23d; the extension of time from May 1st until June 23d for the completion of the machine granted respondent a reasonable time and he was entitled to no more. Finally, while the trial court allowed recovery for the reasonable value of the respondent's services and his equipment, we hold that such relief in quasi contract was precluded by the presence of the express contract.

The litigation emanates from respondent's attempt in the latter part of 1954, or early part of 1955, to construct a machine which would effectuate the quick freezing of individual strawberries. The parties recognized that such a machine would be revolutionary to the strawberry industry. Although respondent had neither constructed nor observed such a machine, he orally agreed to build one. The machine was to have the capacity to freeze 2,000 pounds of strawberries per

hour. The parties orally agreed that respondent retain any patent rights on the machine and that appellant pay $21,454.09 for it.

In 1955 respondent commenced work on this project, and, although appellant used the machine for the last three months of the 1955 strawberry season, its capacity did not exceed between 500 and 800 pounds per hour. In December, 1955, respondent accepted $11,000 ''as payment for the IQF machine . . . with the understanding that any balance due . . . is subject to performance of certain conditions and agreements . . .''

In January, 1956, however, appellant and respondent reached a new agreement,[1] calling for the improvement and

---

[1] ''THIS AGREEMENT made and entered into this _____ day of January, 1956 by and between CENTRAL CALIFORNIA BERRY GROWERS ASSOCIATION, a corporation, hereafter called party of the first part, and JOZOVICH MANUFACTURING CO., hereinafter called party of the second part,

''WITNESSETH:

''THAT WHEREAS heretofore the party of the second part constructed and installed on the premises of JOHN C. MELLO & SON STORAGE CO., in Watsonville, California, for the benefit of first party, a certain quick freezing machine described as an I.Q.F. Machine; and

''WHEREAS said machine has not met the standards and requirements of the first party, as heretofore agreed, and it is the understanding of the parties that said second party will improve and renovate said machine so that the same will comply with the requirements heretofore agreed upon:

''Now, THEREFORE, it is mutually agreed by and between the parties as follows:

''That said party of the second part will install all necessary improvements and equipment to said machine in order that the same will attain a minimum output of 2000 lbs. per hour of individually quick-frozen strawberries of good quality, and reasonably free of damaged berries;

''That said second party guarantees that with the installation of the additional improvements and equipment, and a sufficient water supply to be furnished by JOHN C. MELLO & SON STORAGE CO., said I.Q.F. machine will produce the minimum requirements hereinabove set forth.

''Said party of the second part further agrees that the renovation and modification of said machine and all necessary equipment will be completed and available for operation by the party of the first part on or before May 1, 1956.

''Party of the first part agrees that in consideration of the improvements and performance of said machine, as herein agreed, said first party will pay to the said second party the sum of $15,454.09 in the following installments: The sum of $10,454.09 in cash on or before April 1, 1956, and the balance of $5000.00 on May 1, 1956, if and when said machine is completely renovated and in proper working condition, fulfilling the minimum requirements of party of the first part, so that said machine will produce a minimum output of 2000 lbs. per hour of strawberries individually quick frozen.

''In the event of the failure by the party of the second part to place said machine in the condition herein guaranteed, then in such event the final payment will not be required to be paid by said first party until said

modification of the machine. Respondent signed the contract in the latter part of January or the first part of February; appellant executed it in the latter part of March.

On February 22, 1956, respondent commenced the task of modification. Although he concurred with the advice of independent engineers that the addition of 50 more tons of refrigeration would produce the requisite capacity, respondent did not add the refrigeration unit, allegedly because it would not fit within the building. In any event, from March 2d to April 16th respondent did not work on the machine despite his admitted knowledge that the contract date of May 1st fixed the beginning of the strawberry season; respondent offered as an excuse for this period of inactivity the fact that he awaited delivery of equipment, ordered in October, 1955, which became involved in bankruptcy proceedings. Respondent later testified that the prerequisite shop work also constituted a factor in the delay, and further admitted that the parts tied up in the bankruptcy litigation could be obtained elsewhere. While respondent could not recall the recommendation of independent engineering advisors that the addition of a 50 h.p. compressor would solve the capacity problem, he admitted his agreement with appellant for installation of such a compressor and his actual installation of only a 20 h.p. compressor. Respondent testified that upon payment of funds "promised us" he could have paid for, and installed, the 50 h.p. compressor, and that such a compressor would have facilitated the machine to attain its capacity. On May 1st, respondent did finally obtain this 50 h.p. compressor. He further claimed the earlier delay resulted from appellant's tardiness in signing the contract; his omission to install it after May 1st, he attributed both to

machine complies with and meets the minimum requirements as herein set forth.

"In the event of any dispute between the parties as to the proper performance of said machine, or as to its condition of completion by the time herein required, then the same shall be submitted to arbitration in the usual manner, and the decision of the majority shall be binding upon the parties to this agreement.

"Party of the second part agrees that in the performance of said contract, it will perform the same in a good workmanlike manner, and that all materials and supplies furnished in the installation and modification of said machine will be of good and sufficient materials, and of standard quality, and shall be proper and sufficient for the completion and operation of said machine in accordance with the warranty herein set forth.

"Time is and shall be the essence of this agreement."

appellant's failure to make the April 1st contractual payment and to appellant's continued utilization of the machine.

When, on approximately April 1, 1956, respondent asked Perez, appellant's assistant freezer supervisor, for the $10,454.09 due under the contract, Perez answered, "We'll see." Nevertheless respondent continued working on the machine. According to Perez, when the capacity of the machine still remained at approximately 800 pounds per hour, respondent, at a board of directors' meeting of appellant association on June 16, 1956, informed the board that he intended to install a disc in the machine to enable it to attain the desired capacity, but that if this did not work he did not know the answer. Appellant's witnesses testified that at the meeting of the board, the directors told respondent he would be accorded one more week to complete the machine. Respondent testified he does "not recall" his being at the meeting, although he admits "I could be wrong there." Subsequently appellant's attorney on June 21st formally notified respondent in writing that June 23d constituted a deadline. Respondent's installation of the disc proved to be abortive, and, after June 23d, appellant refused respondent access to the machine. After that date appellant abandoned all use of the machine.

Respondent's amended complaint rested upon two counts: the first pleaded the written contract, previously set forth; appellant's failure to make the April 1st payment; appellant's termination of respondent's access to the machine after June 23d; respondent's willingness and ability to perform his obligations under the contract, and closed with a request for payment of $10,454.09. The second count, with the exception of the request for $10,454.09, realleged all of the foregoing, but it additionally pleaded the $10,454.09 to be due for labor and materials to January 12, 1956; that $5,000 constituted the amount necessary to complete the machine; that respondent expended $4,000 in attempting to complete the machine prior to June 23d, and that this amount represented the reasonable value of parts and labor.

The court gave judgment to respondent for $10,454.09 on his first cause of action; on his second cause of action the court ordered appellant to return to respondent those parts he had installed in the machine subsequent to January 1, 1956, but awarded, in the event appellant failed to comply, a judgment

of $3,687.17 on this second cause; on appellant's cross-complaint for damages the court denied any recovery.

At a post-trial proceeding appellant argued that the judge had changed his position in regard to the second cause of action, modifying a memorandum decision which refused relief to respondent on the second count. Appellant likewise complained that the court improperly refused it a stay of execution. In view of our disposition of this case, however, the post-trial proceedings become immaterial.

The major points of the case involve the question of respondent's right to the intermediate payment in the absence of his full performance, the issue of whether appellant accorded respondent a reasonable time to complete his contract, and the matter of respondent's relief in quasi contract. The first question resolves into the subissues of, first, whether the intermediate payment is severable; and, second, whether respondent's full performance becomes prerequisite to payment.

As to the first question, the divisibility of the contract cannot stand as against the indivisibility of the machine. The parties did not equate two part payments with the installation of separate parts of the machine; the parties bargained for the performance of the whole mechanism; the conception that the two payments were independent would contort the agreement into one for piecemeal payments for separate pieces of machinery. Any such theory conflicts with the express mandate of the contract.

The contract explicitly states that appellant "in consideration" of the "performance of said machine . . . will pay . . . the sum of $15,454.09 in the following installments: The sum of $10,454.09 in cash on or before April 1, 1956, and the balance of $5,000.00 on May 1, 1956, if and when said machine is completely renovated and in proper working condition." Respondent "will install all necessary improvements and equipment to said machine in order that the same will attain a minimum output of 2,000 lbs. per hour." Respondent *guarantees* that the "machine will produce the minimum requirements hereinabove set forth." The contract recites that the parties have entered into this agreement because the machine has heretofore not met appellant's requirements and that respondent "will improve and renovate said machine" so that it will do so. Such provisions as these do not even hint that the bargain comprised less than the single obligation of the installation of a functioning machine.

The language of the contract disposes of respondent's argument,[2] reflected in the findings "That the $10,454.09 for which judgment is now given was the remainder of the $21,000 original cost and was to be paid on April 1, 1956, and is severable from the $5,000." We do not believe the contract can be conjured into a written metamorphosis of the oral agreement. The demise of the prior oral understanding is demonstrated not only by the specific language of the January, 1956 agreement but also by the recitation in the December 19, 1955 receipt for the Association's payment of the $11,000 that "any balance due on this I Q F machine is subject to the performance of certain conditions and agreements between your firm and ourselves." The "conditions" referred "solely to the production of 2000 pounds" by the machine. Thus the antecedent events, as recited in the contract itself, show that respondent, under the oral agreement, failed to produce the promised machine, and that the parties set up a new contract by which they did not conceive of the first installment as an independent payment for past labor but as an intermediate payment for the future production of a machine of a specified performance.

The authorities substantiate our interpretation of the contract as indivisible. ■ Williston's definition of a severable contract discloses its present inapplicability: "A contract under which the whole performance is divided into two sets of partial performances, each part of each set being the agreed exchange for a corresponding part of the set of performances to be rendered by the other promisor, is called a divisible contract. Or, as expressed in the Restatement of Contracts: 'A contract is divisible where by its terms, 1, performance of each party is divided into two or more parts, and, 2, the number of parts due from each party is the same, and, 3, the performance of each part by one party is the agreed exchange for a corresponding part by the other party.' " (3 Williston, Contracts, p. 2408, § 860A (rev.ed.) ; Rest. Contracts, § 266(3), Illustration 4.)

■ *Bartholomae Oil Corp.* v. *Oregon Oil etc. Co.* (1930), 106 Cal.App. 57 [288 P. 814], expresses the general rule that

---

[2]That the underlying theory of the trial court was that the written agreement only provided for payment for work performed under the previous oral agreement finds confirmation in respondent's argument "that this money was in fact due to respondent for work done in 1955" and the "only possible condition under the terms of the contract . . . is that respondent was to continue to try and perfect the machine."

a contract which calls for the payment of a specified sum for performance by the other party is not "severable" merely because payments are divided into installments. In that case plaintiff agreed, for a consideration of $110,000 payable in installments, to drill an oil well to a depth of 4,500 feet, unless oil were struck at a lesser depth. The contract also provided that plaintiff drill beyond the 4,500 feet for additional consideration at the owner's request. Plaintiff drilled to 4,500 feet and then to 5,055 feet at defendant's request but found no oil. Defendant refused to pay the balance of the $110,000 to plaintiff. The court held the contract for drilling to 4,500 feet entire, not severable; that defendant had agreed to pay a gross sum for drilling to this depth even though installments were to be paid as plaintiff's work progressed.

The facts of the New York case of *New Era Homes Corp.* v. *Forster* (1949), 299 N.Y. 303 [86 N.E.2d 757], compare more closely to the instant situation. There, plaintiff entered into a written agreement with defendant for remodeling defendant's home. The provision for payment was as follows: " 'All above material, and labor to erect and install same to be supplied for $3,075.00 to be paid as follows: $150.00 on signing of contract, $1,000.00 upon delivery of materials and starting of work, $1,500.00 on completion of rough carpentry and rough plumbing, $425.00 upon job being completed.' " Defendant defaulted on the $1,500 payment; plaintiff stopped work and sued for that amount. Defendant contended that plaintiff should recover only the actual loss rather than the full $1,500. Although the trial court found for plaintiff, the Court of Appeals reversed, holding that the parties intended a single, entire contract and that the periodical payments, not being allocable to parts of the job, composed scheduled part payments.

Other decisions hold comparable contracts to be indivisible: *Los Angeles Gas & Elec. Co.* v. *Amalgamated Oil Co.* (1909), 156 Cal. 776 [106 P. 55] (contract that plaintiff purchase and defendant deliver all oil needed by plaintiff in its business over a five-year period constitutes an entire contract even though defendant is to be paid at stated intervals: ". . . a contract will be treated as entire, even when the obligations of the one party consist of different acts to be separately paid for, where the nature and character of the agreement show that it was intended to be entire" (p. 779)); *Barris* v. *Atlas Rock Co.* (1931), 118 Cal.App. 606 [5 P.2d 670] (contract for hauling

gravel is indivisible; breach of obligation to pay one install-
ment does not compose "prevention" enabling a suit for the
balance of the contract price); *Kennard* v. *Keeler* (1928), 93
Cal.App. 722 [269 P. 114] (contract for construction of a
grinding plant is entire); *A. H. Andrews Co.* v. *Colonial
Theatre Co.* (E.D. Mich., 1922), 283 F. 471 (contract "to
manufacture, transport, deliver and set up ready for use"
theatre chairs for a specified amount per chair is indivisible
even though certain specified percentage was to be paid at
fixed times).

We conclude as to this subissue that the division of
the payments into two parts did not sever the consideration
that consisted of the installation of a single functioning
machine and that, accordingly, the payments were not inde-
pendent.

The respondent's elected continuance of the con-
tract brings us to the second subissue and to the proposition
that such continuation entailed a full performance. The
Restatement of Contracts, section 273, sets forth: "Where by
the terms of promises for an agreed exchange some perform-
ance by one party is to be rendered before some performance
of the other party and the former performance is delayed
until the time fixed for the latter has arrived, then . . . the
duty to render the former performance with damages for the
delay becomes concurrently conditional on performance of
the latter." See Restatement of Contracts, sections 309, 310.

Although no California case involves a contract
providing for installment payments for the production of a
machine, decisions passing upon contracts for the sale of land
afford an analogous situation. In *McCroskey* v. *Ladd* (1892),
96 Cal. 455 [31 P. 558], a contract for the sale of land, pro-
vided that payment be made in installments, the last of which
became due before the filing of suit. The Supreme Court
stated: "If a recovery of the installment is not sought until
after the time for the payment of the last installment, the
plaintiff must aver and prove the same facts as would be
required in an action to recover the last installment. . . . [I]n
any action brought by him for a part or for the whole of the
purchase-money after all of the payments have become due,
he must aver and prove that before he commenced the action
he had complied with the agreement on his part . . . The
obligations to make these payments, which were originally
independent, have, by his waiver of the right to enforce them,

become dependent and concurrent with his own obligation to convey, and can be enforced only upon his showing that he is not in default.'' (P. 459.) To the same effect: *Boone* v. *Templeman* (1910), 158 Cal. 290 [110 P. 947, 139 Am.St.Rep. 126]; *Sausalito etc. Co.* v. *Sausalito Imp. Co.* (1913), 166 Cal. 302 [136 P. 57]; *Russ etc. Co.* v. *Muscupiabe etc. Co.* (1898), 120 Cal. 521 [52 P. 995, 65 Am.St.Rep. 186]; *Harmon Enterprises, Inc.* v. *Vroman* (1959), 167 Cal.App.2d 517 [334 P.2d 628].

Respondent's contention that conditions precedent are not ''looked upon with favor'' and his citation of *Pacific Allied* v. *Century Steel Products, Inc.* (1958), 162 Cal.App.2d 70 [327 P.2d 547], to that effect, does not apply to the language of this contract in this background. *Front St. M. & O. R. Co.* v. *Butler* (1875), 50 Cal. 574, likewise cited by respondent, is distinguishable on the facts. In that case the involved contract called for plaintiff's construction of a street railroad in San Francisco within a period of six months; when plaintiff railroad brought suit to collect defendant's contracted subscription for payment for the work, the railroad had been completed. The court held that the ''short delay upon the part of the company,'' which ''occurred from fortuitous circumstances apparently beyond its control,'' (p. 577) protracting the construction period beyond six months, did not render unenforceable the collection of the subscription. The court does not reject the rule we have stated above; it passes upon facts which differ basically from the instant case in that here respondent completely failed to perform.

In the fast pace of modern industry, which is inevitable with highly developed technology and complex marketing, and particularly in a situation which relates to the sale and distribution of a perishable crop, we cannot rule that a contract to develop a quick-freeze machine, even if subject to rescission (1 Witkin, Summary of California Law, 7th ed., § 270, pp. 300-301), could, once resumed after breach, carry less than the obligation of full performance. If the producer had rescinded the contract, the association, here, might have taken other steps to protect itself. But the producer having elected to proceed upon the contract, cannot succeed upon less than the promised performance. His cannot be a partial or a defective performance. Asserting his contract, he cannot excise from the agreement that which he had promised to do.

The second major question in the case turns on whether appellant accorded respondent a reasonable time to

complete his contract. In view of the explicit language of the contract and the recognized fact that the machine was to be used in a swiftly moving industry, we believe the extension of time from May 1st until June 23d gave respondent a reasonable time to complete the machine, negating any claim that he was entitled to a further extension.

The words of the contract strongly emphasize the importance of timely performance. Thus respondent "agrees that the renovation and modification of said machine and all necessary equipment will be *completed* and available for operation" by respondent "on or before May 1, 1956." (Emphasis added.) Respondent further agrees that "all materials . . . will be . . . of standard quality, and shall be proper and sufficient for the *completion* and operation of said machine in accordance with the warranty herein set forth." (Emphasis added.) The contract states, "Time is and shall be the essence of this agreement."

This contract was written in the framework of a seasonal industry that began on approximately May 1st, which reached its "biggest months" in May and June and which terminated some four or five months after May 1st. When respondent signed the contract "sometime in February" he "knew that" May 1st related to the beginning of the packing season. Thus the parties contracted with the importance of the seasonal utilization of the machine in mind. Representatives of appellant, concerned with the delay in the perfection of the machine, during the period running from February to June, beseeched respondent to get the machine into production. Uncontradicted testimony shows that Perez and Brooks, both representatives of the association, made frequent contact with the respondent to urge him to hasten completion.

Respondent cannot persuasively contend that an extension of time which ran for seven weeks into a season of three to four months, which, indeed, covered the "biggest months" of the season, did not afford him a reasonable time to complete a machine that should have been ready at the commencement of the season. The record further shows an ample prior period of time to make the machine operative. In view of the long failure to perfect the machine, the short span of the season, and the failure of the disc to improve the situation, the written notice given by the board was not unreasonable.

In defining "reasonable time" as to the preparation of a machine for agricultural use the courts use as an element

in such determination the injury caused by the non-availability of the machine for the handling of a seasonal crop. In *Kutner-Goldstein Co.* v. *Workman* (1931), 112 Cal.App. 132 [296 P. 313], an agreement provided that repairs to a threshing machine be completed "within a reasonable time." The court states, "We think this must be held to be a time making it available for the harvesting of the next crop, in the year 1927. One element in determining whether the time is reasonable, is whether it is within such time as will work no injury on the other party. . . . It seems apparent that if this machine was not repaired in time to harvest the crop of 1927, it would result in injury to the appellant." (P. 135.)

Since we rely upon facts not disputed and upon the language of the contract, we may determine as a matter of law that the period of the reasonable time expired by June 23d. (*Alpern* v. *Mayfair Markets* (1953), 118 Cal.App.2d 541, 547 [258 P.2d 7, 37 A.L.R.2d 1166]; *C. O. Bashaw Co.* v. *A. U. Pinkham Co.* (1926), 77 Cal.App. 591, 594 [246 P. 1064].)

We conclude that this record requires a holding that a reasonable time for the completion of the machine had elapsed by June 23d and that respondent was entitled to no more; under the circumstances, a reasonable time could not extend further into the very season for which the appellant needed the machine.

We turn to appellant's last major point that the judgment inconsistently awards respondent money damages upon contract in the first count and restitution of materials upon quasi contract in the second count. Appellant contends, and we must agree, that the recovery in quasi contract for the reasonable value of the materials conflicts with the recovery allowed upon the express contract:

Respondent's contention that the judgment did not relate to reasonable value but only ordered the return of the materials does find support in the judgment. It is true the court stated, "As of June 23, 1956 . . . Plaintiff had spent the sum of $3,687.17 for parts used on said machine and said sum is the reasonable value of such parts so used. . . . Plaintiff is the owner of and entitled to possession of said parts." The essence of this part of the judgment, however, resides in quasi contract, and, whether or not it is labeled "reasonable value," the relief rests beyond, and in counter-distinction, to, the express contract.

The cases have recognized the common-sense rule that an

aggrieved party may not simultaneously pursue inconsistent procedures for relief. In the case of breach of contract he may treat the agreement as alive and effective, suing for damages for breach, or he may assume the contract dead and proceed to obtain restitution. But damages and restitution constitute alternative remedies and an election to pursue one is a bar to invoking the other. (*Alder* v. *Drudis* (1947), 30 Cal.2d 372 [182 P.2d 195] ; 12 Cal.Jur.2d, Contracts, p. 491, § 260.) As stated in *Lemoge Electric* v. *County of San Mateo* (1956), 46 Cal.2d 659, 664 [297 P.2d 638] : ''. . . since there was an express contract for a sum certain, plaintiff cannot recover on the theory of an implied contract for the reasonable value of services performed.'' To the same effect, *Petersen* v. *Lang* (1956), 144 Cal.App.2d 466, 475 [301 P.2d 397].

We do not believe the two modes of relief afforded by the court can consistently stand; indeed, even in his second count respondent asserts the express contract.

We conclude with some short comments on three final points raised by the parties. First, we do not concur in the finding of the trial court that the transaction constituted a joint venture. The theory finds no support whatsoever in the express contract of the parties, or, indeed, in any evidence in the record. Such a relationship of joint venture would impose upon respondent the obligation to share expenses (*Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942), 20 Cal.2d 751, 764 [128 P.2d 665]) ; yet the record offers no proof that respondent actually assumed such a liability or was willing to do so. Neither party adopted this theory in its pleadings; the pretrial statement does not contain it.

Second, appellant's contentions as to claimed misconduct of the court in the alleged change of its decision, in its refusal to appellant of a stay of execution pending a motion for new trial, and in its rendition of the findings of fact, become immaterial in view of our disposition of the cause.

Third, appellant's contention that the trial court erred in refusing relief on its cross-complaint collapses upon the finding, supported by the record, that it sustained no damages. While appellant may have been entitled to recover for loss of profits resulting from its inability to handle the proffered contracts for frozen berries (*Jegen* v. *Berger* (1946), 77 Cal.App.2d 1, 16 [174 P.2d 489]) appellant's failure to introduce evidence of its net loss of profits proves fatal to its claim. As this court stated in *American Fire etc. Service* v.

*Williams* (1959), 171 Cal.App.2d 397, 404 [340 P.2d 644], "Profits, of course, are the amount of gross income less the amount of costs. Plaintiff, in this regard, only proved the amount of gross profits it lost and not the net profits. Plainly, the plaintiff did not meet the burden of proving damages." Similarly in the instant case the evidence reveals that appellant diverted the berries it intended to use in fulfilling the proffered contracts to other uses; no testimony, however, reveals the cost of preparing I.Q.F. berries as compared to the cost for these other berry processes. Appellant's evidence established only that I.Q.F. berries sold for more than other types of processed berries; it did not establish appellant's net loss of profits.

In summary we hold that recovery of the intermediate payment by the manufacturer after the date for full performance, such performance having totally failed, negates the consideration flowing to the other party, the customer; it is incompatible with the exchange of performances written in the contract. It is compatible only with the theory, apparently followed by the trial court, that the written contract did no more than reincarnate the oral one. But such an interpretation ignores the terms of the written contract, and a judgment based upon such an approach cannot stand.

We reverse the judgment, insofar as it relates to respondent's amended complaint, with directions to enter judgment for appellant upon both causes of action contained therein; we affirm the portion of the judgment denying appellant any recovery upon its cross-complaint.

Bray, P. J., and Duniway, J., concurred.