[Civ. No. 31135. Second Dist., Div. Four. May 2, 1968.]

MILDRED DIDIER, as Administratrix, etc., Plaintiff and Appellant, v. AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA et al., Defendants and Respondents.

Edward B. Freed and Jay J. Plotkin for Plaintiff and Appellant.

Robert E. Herrmann, Anderson, McPharlin & Conners and Robert C. Haase, Jr., for Defendants and Respondents.

COLLINS, J. pro tem.*—This appeal arises out of one judgment entered with respect to two separate actions brought by Mildred Didier, as administratrix of the estate of her husband, Michael E. Didier, deceased, who, at the time of death on February 22, 1961, was licensed as a general construction contractor, doing business under the name of M. E. Didier Company. In one case (SWC 4090) American Casualty Company of Reading, Pennsylvania (American) is the defendant; in the other case (SWC 4092) United States Fidelity and Guaranty Company (U.S.F. & G.) is the defendant. In each action plaintiff asked for declaratory relief and for judgment that each defendant holds funds as constructive trustee for her late husband's probate estate.

In 1960 plaintiff's intestate was the successful bidder on two separate school building projects.[1] Thereafter he entered into contracts which obligated him to furnish two sets of surety bonds for each project. The material and labor and faithful performance bonds on the Los Angeles City High School District project (University High School and Alexander Hamilton High School) were furnished by American. Prior thereto M. E. Didier and his wife Mildred Didier (plaintiff herein) executed a "General Agreement of Indemnity" in favor of American which covered all bonds and undertakings theretofore and thereafter to be furnished by American in Didier's behalf. Similar bonds on the Los Angeles City High School District project were furnished by U.S.F. & G. Likewise the Didiers executed a "General Indemnity Agreement" in favor of U.S.F. & G. before the bonds were furnished.

At the time of his death Didier had been performing construction work on the high school district project for approxi-

---

*Assigned by the Chairman of the Judicial Council.

[1]The contract with the high school district was signed May 16, 1960. The contract with the city school district was signed November 15, 1960. At that time the Board of Education of the City of Los Angeles served as the governing board for both districts. Effective July 1, 1961, both districts were merged into the Los Angeles Unified School District of Los Angeles County under the same governing board.

mately nine months and on the city school district project for approximately three months.

On March 6, 1961, the contract supervisor for the high school district sent letters to the Didiers and to American stating that he was informed that neither the M. E. Didier Company nor the estate of M. E. Didier was prepared, or in a position, to continue the construction work and that it would seem to devolve upon the surety to take the necessary steps under its performance bond to complete the project; attention was called to a contract provision for a definite completion date and liquidated damages for any overrun of such period. Request was made of all parties addressed that information as to their plans be furnished at the earliest possible date.

On March 14, 1961, American's attorney replied stating that the contractor's organization "has had a complete failure of organization and is no longer prepared nor has the ability to continue the projects to completion"; that an audit of the books indicated inability to meet obligations as they arise, and that the payables far exceed the cash position. American stated that it elected to exercise its rights under the General Agreement of Indemnity for an assignment and transfer of all the contractor's rights under the contract, and stated its intention to continue the completion of the project either directly or by means of a nominee.

On March 20, 1961, the board of education authorized recognition of the "default assignment" filed by American.[2] Thereafter, American undertook to complete the work, using as its subcontractor, Kenneth Didier, decedent's son. American submitted to the district a request for payment for the work performed by Didier during February 1961, and was paid $30,256 on an earned bill of $33,556.18 (10 percent retainage was withheld until completion of the work pursuant to the contract). The entire sum is claimed by plaintiff as an asset of the probate estate, although in March 1961 she had consented to the completion of the work by American. Ameri-

[2] One of plaintiff's trial exhibits (No. 22) is a communication dated March 20, 1961, from the superintendent of schools to the board of education advising that American has elected to complete the project in view of the inability of the contractor to do so, and that the "wife [sic] of the contractor is presently attempting to qualify as administratrix of the contractor's estate and has given her consent to the arrangement." This intra-office communication states that the county counsel's office has approved such procedure. We take judicial notice that the county counsel is the law representative of the board of education.

can ultimately paid $93,431.20 in excess of all amounts paid by the school district pursuant to the contract.[3]

With respect to the Gates School project, the contracting officer on March 6, 1961, sent notifications to the Didiers and to U.S.F.& G. similar to those sent on the same date to the Didiers and to American, *mutatis mutandi.* Thereafter a three-way understanding was effected under which R. J. Daum Co. made an agreement with the board of education to complete the job, and U.S.F.& G. agreed to pay Daum $20,000 in addition to the cost of completing the work, and also agreed to pay all bills incurred prior to the take-over by Daum. On April 24, 1961, Daum submitted to the board a request for payment of all work completed to that date in the amount of $24,976 and this request was honored by the board. ($2,497.02—the 10 percent retainage provided in the Didier contract was withheld.) Plaintiff claims the entire sum as an asset of the probate estate, and argues that although it was paid to Daum, the latter was merely the conduit used by U.S.F. & G., which latter asserts that its loss under the indemnity agreement amounted to $55,365.46. Plaintiff also asserts that certain materialmen were paid twice for the same services because the amounts had been included in a previous report of performance. We treat the latter contention, even if valid, as of no relevance to the appeal, especially so since the school district was not made a party to the action.

It is plaintiff's basic claim on appeal that the two construction contracts, being personal in nature, ceased to exist on February 22, 1961, the date of death of the contractor, and that all moneys earned by him but not paid up to that date are assets of his probate estate, subject to administration in a pending probate proceeding and that defendants hold these moneys as constructive trustees for the benefit of the probate estate.

The controlling issue in these cases is whether the construction contracts called for the performance of purely personal acts which could not be performed by others with the result that the contractor's death discharged the obligation, or whether the contracts called for services of such a character that they may be as well performed by others in case the contractor dies before performance is had.

In California there are two appellate court decisions which

---

[3]American's answer to the complaint alleged that American filed a general contractor's claim against the probate estate in the amount of $94,077.74.

require consideration because opposite conclusions were reached.

Plaintiff relies heavily on the case of *Central Contra Costa etc. Dist.* v. *National Surety Corp.*, 112 Cal.App.2d 61 [246 P.2d 150]. In that case the plaintiff sanitary district pursuant to statute, published a notice inviting bids for the contemplated project. Tom L. Gogo was determined to be the lowest responsible bidder. By resolution the sanitary district accepted the bid and authorized its officers to execute a contract with Gogo. At the time of filing his bid and in compliance with the terms of the invitation, Gogo submitted a bid bond furnished in his behalf by National Surety Co. The notice of award and copies of the contract were mailed to Gogo, who received them in the morning and died in the evening of the same date without having signed the contract or the faithful performance bond. However, the proposed contract itself recited that Gogo had 10 days within which to execute the papers. After his death no demand was ever made upon his personal representative to execute the contract or perform the contemplated work. Instead, the sanitary district, by resolution, called for new bids for the same work and by separate simultaneous resolution declared Gogo's bond forfeited and authorized suit. The suit which followed was for recovery of the difference between the amount of the Gogo bid and the higher bid of the contractor who performed the work. The trial court found that the execution of the formal contract was prevented by "an irresistible, superhuman cause," namely, Gogo's death. The court considered that the signing of a formal contract "was a purely personal performance act which could not be, and which it was not contemplated or intended" by Gogo should be performed by any other person. The court further concluded that the death of Gogo before the expiration of the 10-day period allowed for him to sign the formal contract operated to discharge both parties from the obligation of executing the same; that Gogo's bid and the award of the contract to him "resulted merely in a contract by which he and plaintiff became bound to execute a formal contract . . . ; and until . . . such formal contract was executed there was no obligation . . . to perform the work. . . ." (112 Cal.App.2d at p. 64.)

The court adverted to certain provisions in the contract specifications, to wit: " '. . . The competency and responsibility of bidders as evidenced by the information accompanying the proposals, which will be subject to verification, will be considered in making the award.'

·"; . . 'The Contractor shall not assign, transfer, convey or otherwise dispose of the contract, or his right, title or interest therein, or his power to execute such contract, to any other person, firm or corporation without previous consent in writing of the Sanitary Board. . . .' " The contract which was submitted to, but had not been signed by Gogo, contained a similar provision with added language as follows: " '. . . any such transfer shall cause annulment of this contract, so far as the Owner is concerned.' " (112 Cal.App.2d at p. 68.) The Notice Inviting Bids also stated that the bidding contractor should list all subcontractors and if he failed to do so, he would be deemed to have agreed to perform such work himself and would not be permitted to subcontract the same without previous written permission of the sanitary district.[4] The Gogo proposal named no subcontractors. In affirming the trial court's determination the appellate court observed: "The record here supports the view that the parties contemplated not only that the contract following the award should be executed by the successful bidder, but also that he alone should perform it." (112 Cal.App.2d at p. 68.) In short, it appears that the appellate court accepted the trial court's evaluation of the limited factual record and inferences to be drawn therefrom.

Defendants rely on *Estate of Burke,* 198 Cal. 163 [244 P. 340, 44 A.L.R. 1341]. There a general creditor of the probate estate of an intestate building contractor appealed from an order of the probate court which allowed the administrator to recover as a cost of administration a loss of approximately $7,000 which he incurred in carrying to completion two construction contracts which had been only partially performed at the time of the death of the constructing contractor. The creditor's objections to the allowance to the administrator were based on various probate procedural grounds which the court found to be lacking in merit. The court disposed of them with the observation that (198 Cal. at p. 167): ". . . The parties with whom the contracts were made were entitled to have them respected, and there is no evidence or suggestion that performance was waived by them. Whether it would have been to the interest of the estate, and the creditors as well, for the administrator to have refused to perform, on the theory that any damages recovered against the estate for a breach would have been smaller than the loss suffered by perform-

[4]Such a contractual provision was required by the California Subletting and Subcontracting Fair Practices Act (formerly Gov. Code, § 4104 renumbered § 4107, and amended, Stat. 1963, ch. 2125, § 8.)

ance, was at best a question addressed to the judgment of the probate judge." The court further noted that the decedent had made contracts "binding himself and his personal representative to perform the covenants which were subsequently performed by the administrator." (198 Cal. at p. 167.)

 In disposing of the crucial issues the court said (198 Cal. 167-168) : "The general rule is that it is the duty of an administrator to perform the contracts of his intestate unless the acts to be performed are personal, such as an author to compose a particular work, an artist to paint a particular painting, a sculptor to produce a particular piece of statuary or other work of art, or a lawyer or physician to render services. Contracts to perform such personal acts are discharged by death or by the disability of the person who was to perform said acts. This rule, however, does not apply where the services are of such a character that they may be as well performed by others [citations], nor where the contract by its terms shows that performance by others was contemplated. [Citation.] Ordinarily, a building contract is not to be brought within that class of contracts which are deemed to have been entered into because of the personal skill or taste of the persons who are to perform them. [Citations.] It is otherwise, of course, where it is made to appear, as remarked by Lord Denman, that the 'character, credit and substance of the party' contracted with was an inducement to the contract. A building contract may, from the character and kind of work to be performed, properly fall within the rule of 'personal performance acts.' But this is not such a contract."

Several factual differences distinguish this case from the *Central Contra Costa Sanitary Dist.* case, *supra,* 112 Cal.App. 2d 61. In the *Sanitary District* case a formal contract was never signed and, consequently, performance had never begun thereunder. Hence, there was no evidence indicating the contractor's actual or contemplated mode of performance,— whether by his own workmen or by subcontractors. In the present case the record shows that substantial work was performed by subcontractors.[5] Upon Mr. Didier's death both school districts directed notices to plaintiff and to defendants

---

[5]The "Bid Form" executed by Didier for the city school district's project (Gate Street School), in compliance with the provisions of Government Code sections 4100 through 4108, in effect at time contract was signed, lists 23 separate portions of work for the performance of which Didier listed the respective "subcontractors" (Exhibit 40). Likewise, plaintiff introduced in evidence several documents which showed that Didier made agreements with subcontractors for electrical, plumbing and hardware work in excess of $150,000. (Exhibits 87, 88, 89, 90, 91 and 92.)

that if the estate or its representative did not correct existing defaults the districts would complete the work by whatever methods were expedient and that the defendants promptly undertook to perform. Thus, it appears that all parties by their contemporaneous conduct took the position that Mr. Didier's death did not bring to an end the contractual nexus, albeit plaintiff chose to change her position thereafter.

In the present case the contracts had been signed and work thereunder was from 50 to 70 percent completed at the time the contractor died. In addition the contractor's wife, in her individual capacity, was a coindemnitor under the respective indemnity agreements with each defendant bonding company, the very broad and comprehensive language of which authorized the latter, upon contractor's abandonment, forfeiture or breach of the construction contract, to take possession of the work and complete the contracts.

All of these factual elements justified the trier of fact in concluding that personal performance was not contemplated and that the rule applied in the *Burke* case, *supra,* 198 Cal. 163, applies here. We do not regard the *Central Contra Costa Sanitary Dist.* case, *supra,* 112 Cal.App.2d 61, as declaratory of opposing legal principles; and when restricted, as it should be, to the facts there in judgment it does not contravene the views here expressed. We hold that the two construction contracts survived Mr. Didier's death, and continued as obligations of his estate.

Plaintiff's related argument is that even if the contracts did not end with death, the earned installments, less the 10 percent retention, were debts of the school districts payable forthwith into the probate estate. Defendant U.S.F.& G. answers this argument by asserting that the contracts were entire, not severable, in character, and that they were entitled to receive the installments under principles of equitable indemnification. We feel that determination of this appeal does not require us to pass on the severable or entire character of the contracts[6] in view of the very comprehensive rights of

---

[6]The provisions for payments on the contracts in monthly installments does not require a determination that the contracts were severable. As the court stated in *Bartholomae Oil Corp.* v. *Oregon Oil etc. Co.,* 106 Cal.App. 57, at p. 64 [288 P. 814]: ''Ordinarily, when one party contracts to do certain work or perform certain services and the other party agrees to pay a specified price therefor, the contract is to be regarded as entire. [Citation.] Such a contract is not severable merely because the installments are made payable as the work progresses, or even because it is stipulated that the final payment is to be made from proceeds which may be expected to be derived as a result of the enterprise, provided it

indemnification reserved to each defendant in its indemnity agreement with the decedent, and with plaintiff individually, indemnification was a matter of contract right and there was no need to resort to equitable subrogation.

■ Plaintiff argues that the trial court should have made separate findings and conclusions of law in each case and then entered a separate judgment. The two actions were tried on the same date. At pretrial, and pursuant to stipulation, they were "consolidated for all further proceedings, including pretrial and trial."

Following a nonjury trial, the trial judge made a single set of findings of fact and conclusions of law, and signed a single judgment. We regard the case of *McClure* v. *Donovan*, 33 Cal.2d 717 [205 P.2d 17], as declaratory of the rule to be applied. There the court said (pp. 721-722): "Ordinarily, consolidated actions may be determined by a single set of findings and a single judgment—'the allegations of the various complaints may be taken together and treated as one pleading' (*Simpson* v. *Bergmann* [consolidation of actions to foreclose mechanics' liens, Code Civ. Proc., § 1184a], 125 Cal. App. 1, 6 [13 P.2d 531]) and 'for the purposes of all further proceedings, the cases are to be treated as if the causes had been united originally' (1 Cal.Jur. § 51, p. 374). . . ." (See also *Page* v. *Bakersfield Uniform etc. Co.*, 239 Cal.App.2d 762, 772 [49 Cal.Rptr. 46]; cf. *McFarland* v. *Booker*, 250 Cal.App. 2d 402, 416 [58 Cal.Rptr. 417]; 2 Witkin, Cal. Procedure (1954), Pleadings, §§ 156, 157, pp. 1134-1135.) ■ Plaintiff also argues that the trial court failed to make any finding as to the amount of money, including retention, due to Didier at the time of his death on the city school district contract for which U.S.F.& G. was surety. Indeed, there was such an omission to find, but we feel that it was an oversight, and our own examination of the record persuades us that if a finding had been made it would have been the same *mutatis mutandi* as the one made with respect to the city high school district

does not appear from the contract that the procuring of the anticipated result or securing proceeds from sales of the expected commodity is mutually intended by the parties to be a condition precedent to the payment of such installments. [Citation.]" (See *Jozovich* v. *Central Cal. Berry Growers Assn.*, 183 Cal.App.2d 216, at pp. 224-225 [6 Cal.Rptr. 617]; *World Sav. & Loan Assn.* v. *Kurtz Co.*, 183 Cal.App.2d 319, at pp. 327-328 [6 Cal.Rptr. 665].)

Also, see *Palmer* v. *Fix*, 104 Cal.App. 562, at pages 569 and 570 [286 P. 498], for further discussion of the line of demarcation between entire and severable contracts. The court there said (p. 570): ". . . it is a question of interpretation to be determined according to the intention of the parties upon consideration of all the circumstances."

contract which applied to American. In these circumstances it is not necessary to remand the case to the trial court for the making of such a finding, for it will not change the trial court's decision.

 Another ground of appeal is that the trial court erred in sustaining defendant's objection to the introduction in evidence of a notice inviting bids on the ground of immateriality.[7]

In sustaining the objection the court said: "It wouldn't be material. The invitation to bid would not be material now unless you contend there was some kind of a conflict. It doesn't make really any difference in this case whether there is a conflict between the contract and the specifications. The public body calls for bids. People put in bids. The public body awards a contract and they enter into a contract. All that goes before is thereby merged in the contract so what do we need the invitation to bid for?" Thereupon, plaintiff's counsel pointed out that in the *Central Contra Costa Sanitary Dist.* case, *supra,* 112 Cal.App.2d 61, the court had considered the notices inviting bids as bearing on the issue whether they were personal contracts. The court then replied that "[i]n the absence of a showing that there is some variation" between the notice and the contract the ruling would stand. No such variation was suggested. Plaintiff's counsel made no offer of proof and the proposed exhibit was not marked for identification and is not part of the record on appeal. Very probably, it was identical or similar to a "Notice to Contractors" which plaintiff put in evidence (see footnote 7). We must conclude, as did the trial judge, that all the material anent the personal character of the obligation was "merged in the contract," in which case the proffered evidence was immaterial; moreover, it appears that such evidence would be merely cumulative. We perceive no error in the trial court's ruling on this point.

For all of the foregoing reasons, the judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 26, 1968.

---

[7]It appears from the record that a Bid Invitation was received in evidence, it being a published "Notice to Contractors" pasted to a Proof of Publication (Exhibit No. 3).