[Civ. No. 49839. Second Dist., Div. One. Sept. 5, 1978.]

DEAN W. KNIGHT & SONS, INC., et al.,
Cross-complainants and Respondents, v.
FIRST WESTERN BANK AND TRUST COMPANY,
Cross-defendant and Appellant.

COUNSEL

Donnelly, Clark, Chase & Johnson, Claire D. Johnson, Carol A. Consolver, Ernest S. Gould, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Herman F. Selvin and Peter C. Bronson for Cross-defendant and Appellant.

Thomas E. Garcin for Cross-complainants and Respondents.

OPINION

**THOMPSON, J.**—This appeal is from a judgment on a cross-complaint awarding Dean W. Knight & Sons, Inc., and its sole stockholder $831,388

in damages for the fraud of First Western Bank and Trust Company. In addition to an attack upon the adequacy of the trial court findings to establish materiality of the bank's misrepresentations and to establish reliance upon the misrepresentations, and a wholesale assault upon the sufficiency of the evidence to establish damage, the appeal involves an apparently novel issue of the measure of damages for loss of profit caused by fraud where, by reason of the peculiar nature of the defrauded business, profit is delayed rather than forever lost.

We conclude: (1) that the court's findings of fact are adequate to support the judgment and the evidence is sufficient to support findings of damage to the cross-complainant; but that (2) the measure of damage to the cross-complainant's profit is the financial loss in the delay in the realization of profit rather than the total profit temporarily denied to it by the cross-defendant's fraud. Because the trial court relied upon expert testimony applying an improper measure of damages, we remand the matter to the trial court for retrial of the issue of damages only.

Dean W. Knight & Sons, Inc., is a corporation wholly owned by Dean W. Knight. In 1961, Knight, together with Richard Wagner, entered the building business by developing a tract of houses known as Grandview Heights in the Bishop area of the Owens Valley. In the course of the development, Knight established a banking relationship with United California Bank through its representative, Reginald Burton.

The Grandview Heights development neared completion and the sale of its parcels in 1964. In April of 1965, Knight, Inc., acquired the Reynolds Ranch, a 78-acre parcel of property near Big Pine about 14 miles south of Bishop. Knight and Knight, Inc., planned a 279-unit development of homes and lots known as Rolling Green Terrace upon the property and contemplated that after the units were sold, Knight would continue to realize profit from privately owned utility systems serving the project. The development and sale of units in Rolling Green Terrace was planned to occur over a 10-year period with 100 to 110 units to be sold in the first 5 years.

Knight, Inc., planned upon an excess of expenditures over cash flow from the project in the first five-year period because of initial development cost. Development was planned in phases designated by numbered "tracts."

Prior to December 1966, Knight, Inc., dealing through Burton, obtained financing for the project from United California Bank. Near the end of that year, Burton left UCB to become an officer of First Western. Burton took the Knight, Inc., account with him, and from December 1966 onward First Western supplied the financing. Burton supervised the Knight, Inc., account at First Western until he left that bank in February of 1969. From that point the account was handled by Darrell C. Campbell, a vice president of First Western, supervised by Senior Vice President Francis D. Nash. Knight and Knight, Inc., obtained land loans for the grading and installation of streets and utilities, construction loans for houses built upon the property for sale, and working capital loans because of the excess of development cost over cash flow in the first stages of the development. The land loans and construction loans were secured by deeds of trust. The working capital loans were unsecured. All were guaranteed by Knight personally. With full acquiescence of Campbell and First Western, Knight, Inc., borrowed on a land loan secured by property in "tract 3" of the development amounts in excess of that needed for that tract and used the excess in the development of "tract 4" to obtain the economic advantage of work related to both tracts.

Sales of lots from the development from its inception to September 30, 1969, and the financial results were as follows:

| Fiscal Year | No. of Lots Sold | Book Loss |
|---|---|---|
| September 30, 1966 | 27 | |
| September 30, 1967 | 19 | $32,025 |
| September 30, 1968 | 16 | $68,302 |
| September 30, 1969 | 22 | $66,429 |

By the end of 1969, Knight, Inc., was acutely short of working capital. On January 14, 1970, it owed First Western $30,000 on a secured and past due loan, $36,000 on secured construction loans on houses under construction in the development, $140,000 in secured loans on which payments were current, and over $79,000 on an unsecured loan.

Campbell informed Knight that Title Insurance and Trust Company was interested in recreational land development in the Owens Valley. He and Knight prepared a written proposal by which T.I. would participate in the Rolling Green development and supply financing so that the remaining undeveloped property could be completed and sold quickly rather than in increments. When T.I. said that it was interested in the

proposal, Campbell arranged for Knight to meet with representatives of T.I. In early January of 1970, T.I., tentatively and subject to board of directors approval, agreed to participate in the development and to guarantee a new $264,100 loan from First Western. The $264,100 was to be used to discharge Knight, Inc.'s obligations to First Western, except for the $140,000 current secured loan, and for working capital for completion of "tract 4."

On January 14, 1970, First Western, acting through Nash and Campbell, induced Knight to execute and deliver to First Western an assignment of collateral which encumbered most of the Knight and Knight, Inc., assets not previously pledged or encumbered to First Western to secure its loan. By the assignment, First Western obtained additional collateral of a gross value of over $1.5 million but subject to encumbrances.

Nash and Campbell obtained the assignment from Knight by falsely representing that "[t]he only reason the Bank wanted to take that collateral was to keep Knight from becoming involved in any other business ventures while he was indebted to the Bank with T.I. . . . as a guarantor." In fact, Nash and Campbell knew that First Western wanted the additional collateral to secure its previously unsecured loan to Knight, Inc. While representing that upon execution of the collateral assignment, First Western would supply additional and urgently needed financing to Knight, Campbell had no reason to believe that the bank would do so. Knight would not have delivered the collateral assignment except for the misrepresentations. He had no reason to believe they were false.

On January 23, T.I. told Knight that it was deferring further real estate investments for 30 to 60 days and that it would not guarantee the contemplated new loan of $264,100 from First Western. That day Campbell led Knight to believe that First Western would foreclose on its security.

Knight consulted a lawyer specializing in bankruptcy matters. Because of First Western's action in encumbering Knight's assets, the lawyer advised Knight to file a chapter XI proceeding pursuant to the federal Bankruptcy Act. The petition was filed on February 5, 1970. Although legal proceedings incident to the chapter XI proceeding resulted in First Western returning the additional collateral shortly after the filing, the

chapter XI proceedings had "stigmatized" the name of the company so that Knight was unable to borrow additional funds against the collateral.

During the time the chapter XI receiver continued to operate Knight, Inc., and by reason of a commitment to the county board of supervisors, First Western advanced an additional $120,000 for completion of 80 lots in "tract 4." Rather than selling completed homes, the receiver offered only lots for sale. Lot sales from the development were slow because of the need of buyers to pay the full price for them if they were to secure construction financing. The chapter XI proceeding continued for about five years. During that period, Knight, Inc., had net earnings of $80,750. It incurred interest expense over and above that it would have incurred in the ordinary course of business in the amount of $166,000 and attorneys' fees of $77,858 attributable to the bankruptcy court proceeding.

For a period from March 30, 1972, until August 29, 1974, lot sales were prohibited or inhibited by cease and desist orders from a regional water quality control board and the Real Estate Commissioner because of claimed defects in the development's sewer facilities. Eventually, all creditors were paid and the chapter XI proceeding was terminated. Because of changed market conditions, the development was worth more after the termination of the chapter XI proceeding than at the time of the fraud. After the termination of the proceedings, Rolling Green Terrace was an economically sound development.

At trial on their cross-complaint claiming damages for the fraudulent misrepresentations of Nash and Campbell, Knight and Knight, Inc., proved their damage by the testimony of Ralph Clements, an expert business appraiser and consultant to government contractors and others in the calculation of damage caused by change orders or delays in contracts. Clements' expertise included projections of sales and earnings for the reporting purposes of major corporations in the aerospace field.

Clements computed Knight and Knight, Inc.'s lost profit by: (1) opining that absent the fraud the development would have generated sales of 25 lots per year during the five years of the chapter XI proceeding; (2) projecting the profit on sales by deducting cost of production per house and lot from an assumed sales price based upon actual sales of comparable properties; and (3) deducting the net earnings actually attained during the chapter XI proceeding.

The trial court in general accepted Clements' opinion. It determined damages for lost profits in the amount of $560,530. That amount, plus the "excess interest" of $166,000 and chapter XI attorneys' fees of $77,858, was awarded as actual damages. Punitive damages of $27,000 were assessed.

In this appeal, First Western contends: (1) the trial court made no findings of fact concerning materiality of or justifiable reliance upon the misrepresentation;[1] (2) there is no evidence that the chapter XI proceeding caused any damage to Knight or Knight, Inc.; (3) Clements lacked the expertise that is the necessary predicate to his opinion testimony as an expert; and (4) Clements' opinion is not substantial evidence because (a) it is rebutted by "judicially noticeable facts" concerning the Owens Valley which First Western asserts on appeal but which were not raised at trial, (b) it is based upon an unsupported projection of annual sales of lots that would have occurred absent the fraud, and (c) it is based upon facts not in evidence, is based upon hearsay and other incompetent evidence, projects profits from a new and untried enterprise, and calculates damage upon the basis of lost rather than deferred profit. First Western argues also that, in any event, much of the deferment of profit was due solely to the cease and desist orders resulting from the charge of inadequate sewage disposal.

At the outset, we summarily address those of First Western's contentions that are adequately treated by brief reference to the record. The trial court did find that the misrepresentations were material and that Knight and Knight, Inc., relied upon them when making the assignment of additional collateral. ■ Contrary to First Western's argument, there is evidence that the chapter XI proceeding aborted the development by "stigmatizing" it so that it could no longer be financed and by resulting in an effort to sell lots rather than completed homes. ■ The determination of Clements' qualification as an expert was a matter for the trial court and that court's determination to accept his expertise cannot be overturned if founded on a reasonable basis. (Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1972) § 29.3.) Here the reasonable basis is

---

[1]In its reply brief, First Western introduces the issue that the findings of materiality and reliance are not supported by substantial evidence. Because the contention is untimely, we do not consider it (*Brenkwitz* v. *City of Santa Cruz* (1969) 272 Cal.App.2d 812 [77 Cal.Rptr. 705]) beyond noting that Knight and Knight, Inc., were placed in a materially disadvantageous position by having parted with their collateral without having T.I. as a participant in the project.

established by Clements' extensive experience in financial projection. We ignore the "judicially noticeable facts" which First Western presents for the first time on appeal to cast doubt upon the credibility of Clements' testimony. Those facts are by no means conclusively established. To consider them would require us to retry the lawsuit, giving First Western the benefit of testimony presented without cross-examination. The sales projection by Clements as reduced by the trial court finds support in the past performance of the development and First Western's own appraisals of it. ■ An expert witness may base his opinion upon "matter . . . that is . . . made known to him at or before the trial; . . . that may, but need not be, admissible in evidence; . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his opinion relates." (Jefferson, *id.*, § 29.4.) Here the Clements' opinion is based largely upon documents of First Western and appraisals to the chapter XI receiver as well as upon accounting statements. This basis is of a type upon which experts may reasonably rely. ■ The fact that the development had not yet generated a profit at the time that First Western committed its fraud does not of itself prevent recovery of damages for loss of profit so long as there is an evidentiary basis establishing that the loss period was a foundation for profitable operation. (*Natural Soda Prod. Co.* v. *City of L. A.* (1943) 23 Cal.2d 193, 199-200 [143 P.2d 12].) Evidence of that foundation is present in First Western's own projections based upon the sales history of the development.

There is substance to First Western's contention that Clements and the trial court applied an improper measure in determining the damage flowing to Knight and Knight, Inc., from the fraud.

Knight and Knight, Inc., are entitled to recover as compensatory damages only the amount which will compensate them for all the detriment proximately caused by First Western's tortious conduct. They cannot be placed in a better position than that which they would have occupied absent the fraud. (*Valdez* v. *Taylor Automobile Co.* (1954) 129 Cal.App.2d 810, 821-822 [278 P.2d 91]; see Civ. Code, §§ 1709, 3333; *Overgaard* v. *Johnson* (1977) 68 Cal.App.3d 821, 827 [137 Cal.Rptr. 412].) Here the amount necessary to compensate Knight and Knight, Inc., for sales "lost" in the five years that sales were inhibited by the chapter XI proceeding is only the economic loss occasioned by delay. Theirs was not a business with replenishable inventory of raw material and finished goods where a sale lost in one year is a sale that can never be made again. Knight and Knight, Inc., were engaged in a real estate development of

finite size. There is no evidence in the record to support the inference that they could have replaced their inventory of land if the lots had been sold during the period when the consequences of the fraud were at work. When the effect of the fraud terminated, the lots in the development were fully salable at no diminution in value or sales price.

Hence the trial court erred in accepting as a measure of damage the amount of profit that would have been realized upon sales during the period of the effect of the fraud over that actually realized.   ■   For the guidance of the court on retrial, we note that damage to Knight and Knight, Inc., flowing from the delay in sales caused by the fraud includes "holding costs" of the land such as interest on borrowings to finance it and other expense incident to delay (*Russell* v. *First Am. Mtg. Co.* (1977) — Colo.App. — [565 P.2d 972, 974]; see *Allen* v. *Enomoto* (1964) 228 Cal.App.2d 798 [39 Cal.Rptr. 815]) undiminished by enhancement in value of the property during the period. (*Russell* v. *First Am. Mtg. Co., supra,* 565 P.2d 972.) Recoverable damages for delay in salability of the lots are of course limited to delay proximately caused by the fraud. We leave to the trial court on remand the task of determining the consequences of the cease and desist orders to that issue.

The judgment is reversed as to damages but affirmed as to liability. The matter is remanded to the trial court for retrial of the issue of damages only.

Lillie, Acting P. J., and Hanson, J., concurred.

A petition for a rehearing was denied October 4, 1978, and respondents' petition for a hearing by the Supreme Court was denied November 1, 1978.