[No. A015136. First Dist., Div. Three. Sept. 26, 1985.]

C. NORMAN PETERSON CO. et al., Plaintiffs and Appellants, v.
CONTAINER CORPORATION OF AMERICA et al.,
Defendants and Appellants.

**COUNSEL**

William H. McInerney, Arthur R. Abelson, Randy O. Wright, McInerney & Dillon, Athearn, Chandler & Hoffman, Clark W. Maser and Wendell H. Goddard for Plaintiffs and Appellants.

David Van Hoesen, Paul A. Conroy and Williams, Van Hoesen & Brigham for Defendants and Appellants.

**OPINION**

**ANDERSON, J.**\*—This is an action for breach of construction contract and for the reasonable value of labor and materials. Defendant, Container

---

*Assigned by the Chairperson of the Judicial Council.

Corporation of America (hereafter CCA or the Owner), appeals from a judgment awarding plaintiff, C. Norman Peterson Co. (hereafter CNP or the Contractor), damages in the amount of $2,898,687.47, plus interest. CNP has cross-appealed.[1]

FACTS

A. *Introduction*

In 1976, CCA contracted with CNP for performance of a mill modernization project at CCA's papermill located in Santa Clara, California. The mill recycles waste paper into carton materials. CCA supplied the major items of equipment, and CNP supplied the labor and materials necessary to enlarge the building and to install new machinery.

Basically, CNP was to complete the project in 18 months. During the first 14 months, the work was to be performed while the papermill was in operation. During the next two months, work was to be performed while the mill was shut down. This shutdown period was the most critical phase of the project; time was of the essence during this period so the mill could be restarted. There was then to be a two-month cleanup period. CCA concedes the project was completed essentially on time, and the court found that CCA paid CNP $5,544,400 for its performance. A dispute arose over additional amounts, CCA eventually acknowledged it owed an additional $500,178, but CNP filed suit on November 28, 1978.

At trial,[2] CNP contended it was entitled to recover its total costs expended in completing the project due to numerous errors and changes in the construction drawings, which resulted in extra work having to be performed by CNP. CCA, while conceding there were many revisions to the drawings, contended that both parties were aware at the outset that revisions would have to be made, that there was no material change in the scope of the work to be performed, and that the contract set forth the procedure for compensation for performing extra work. Following 16 days of hearings, judgment was entered in favor of CNP for $2,898,687.47 plus interest, representing CNP's total costs expended plus overhead and profit, less receipts.

---

[1]At trial CNP also presented the claim of Judson Steel Corporation, a subcontractor who provided steel fabrication for the project. The judgment awarded includes $63,192.03 on account for Judson.

[2]Pursuant to stipulation, the matter was referred for hearing and determination to the Honorable Robert F. Kane, retired Associate Justice, Court of Appeal, sitting as a referee pursuant to Code of Civil Procedure section 638, subdivision 1. As the stipulation provided that the referee's findings and judgment would stand as the findings and judgment of the court, we shall hereafter use the terms "referee" and "court" interchangeably.

## B. *Precontract Period*

In early 1976, CCA solicited bids from eight contractors for the modernization of its papermill, based upon drawings prepared for CCA by its engineer, Industrial Mechanical Corporation (hereafter IMC) and its architect, Richard J. Huyck and Associates (hereafter Huyck). These drawings were marked for "bidding purposes only." CNP submitted a bid and, on April 20, 1976, CCA sent CNP a letter of intent informing CNP that it had been chosen as the general contractor on the project. Work commenced on the project on May 1, 1976, before the execution of a formal written contract on June 10, 1976.

On April 26, 1976, personnel from CNP, CCA and IMC met to review the mechanical drawings for the project. It was agreed that the drawings were then inadequate for construction purposes, but it was necessary to issue them in their then current form so work could begin by May 1. CNP was promised revised drawings within two or three weeks. In early June 1976 CNP asked about the revised drawings. IMC indicated that some would be completed within 30 days, with the remainder to be completed in 60 days. This deadline, too, was missed. As discussed, *infra,* there were further delays before these drawings were completed.

## C. *The Contract*

On June 10, 1976, the parties entered into a formal written contract, consisting of a general "construction agreement" and a series of more specific "contract documents" (including drawings prepared by the Owner), attached to the construction agreement. According to the trial court's findings, some of the more relevant parts of the contract provided: (1) that CCA would pay CNP for actual net cost of the work, plus a fee of $300,000 and that CNP guaranteed that such cost plus fee would not exceed $4,789,000;[3] (2) that CNP would proceed with utmost dispatch in its performance, and complete the work as soon as possible but no later than October 18, 1977; time was of the essence with respect to the completion date;[4] (3) that CNP would construct the facility in accordance with the contract documents and

---

[3]Paragraph 2 of the construction agreement provides in part: "*Payments to the Contractor.* Subject to the provisions of the Contract Documents, the Owner shall pay the Contractor the Contractor's actual net cost of the work, plus a fee of *$300,000,* the terms 'net cost' and 'fee' being defined in Exhibit B hereto. Contractor guarantees that such cost plus fee shall not exceed *$4,789,000* and that Contractor and not Owner shall be responsible for any excess. . . ." (Original italics.) Pursuant to change order provisions in the construction agreement, the maximum authorized amount was later revised upwards from $4,789,000 to $5,937,114.

[4]See construction agreement, paragraph 1.

the 234 drawings which were attached to and made a part of the contract;[5] and (4) that CCA would reduce the 10 percent retention to 5 percent retention when CNP, in CCA's opinion, had satisfactorily performed over 50 percent of the contract work.[6]

Section 1-04 of the contract's general conditions provided, in part, that the contract documents were complementary and "are intended to include all items required for the proper execution and completion of the work." The general conditions and supplemental general conditions contained provisions relating to change orders (supplemental general condition § 1-57.4), claims procedures (*id.*, at § 1-57.5) and the architect's status in the event of contract or performance disputes (general condition § 1-08).

## D. *Performance*

The contract called for completion of the project by October 18, 1977. The work was, in fact, performed during three distinct phases: (1) from May 1, 1976, through September 6, 1977, preliminary work was performed while the papermaking machines remained in operation; (2) the critical shutdown was completed during the period between September 7, 1977, and November 1, 1977; and (3) the final cleanup phase was completed by January 1, 1978. Although the original completion deadline of October 18, 1977, was not met, CCA concedes that the contract was performed by CNP essentially on time. Further, CCA acknowledges that numerous changes were made during the course of the contract. The dispute ultimately is over the method for determining the costs of those changes.

### 1. *Drawings*

### (a) *Delay in Drawings*

The drawings which IMC had promised CNP in early June would be completed within 30-60 days were not finished on time; thereafter there were further delays in their delivery. IMC made further promises (on Aug. 10, 11, Sept. 2, 23 and Nov. 11, 1976), each time pushing the delivery date

---

[5]See construction agreement, paragraph 1; exhibit "A," paragraph 2, subdivision (b); and exhibit "C."

[6]Paragraph 2, subdivision (e)(5), of exhibit "A" to the construction agreement provides: "Owner will retain an amount equal to 10% of the Contractor's monthly billing, such retainage to be released to Contractor upon successful completion and acceptance of the project. Owner agrees that provided approximately 50% of the contract amount has been billed by the Contractor and provided further that, in the Owner's opinion, Contractor is performing satisfactorily, the amount retained from monthly billings could be reduced to 5%."

for the completed drawings back another 30-60 days, with an eventual promised delivery date of January 1, 1977.[7]

(b) *Drawing Review*

On November 18, 1976, CNP wrote to the architect, with copies to CCA, reciting problems and additional costs CNP was incurring due to delays in receiving the final construction drawings and the omissions and errors in the drawings which were received. Representatives of CNP and CCA met on December 1, and it was then agreed that a drawing review of the piping and electrical drawings was necessary to discover and, through revision, to eliminate the problems in the drawings.

The pipe drawing review took some 165 hours on 36 meeting days between December 6, 1976, and March 23, 1977. The electrical drawing review was carried out during 91 hours of meetings on 21 days between March 24, 1977, and June 16, 1977. This highly unusual drawing review procedure resulted in the final drawings being furnished to CNP in July and September 1977, some 14-16 months after CNP had begun work on the project. The agreed changes became the basis for work request 88. CNP performed that work even though the parties were not yet able to agree on the price for carrying it out.

(c) *Redesign*

The court found that CCA and its engineer, IMC, had expended significant periods of time redesigning the project while CNP was trying to complete its work.[8] For example, CCA originally agreed to pay IMC $212,375 for the design of the facility. During the construction phase, IMC was to serve as the construction manager and also furnish 3,680 man-hours of redesign time for $213,375. CNP was not made aware of this before the construction contract was executed. In fact IMC not only furnished the 3,680 hours of additional redesign time, but another 12,734 hours more during the course of the project. The court made findings that this total of 16,414 hours was "an unreasonable amount of redesign time" after CNP had started work on the project; that the project was "poorly engineered"; and that the excessive number of required changes "was beyond the contemplation of the parties at the time of the execution of the [CNP-CCA] contract."

---

[7] The final mechanical drawings were not given to CNP until July 1977; the final electrical drawings were furnished in September 1977. Even then, there were serious errors and omissions which seriously impacted CNP's work schedule and costs.

[8] CNP does challenge these findings on appeal.

## 2. *The Shutdown Period*

### (a) *Change Order No. 6*

Because of the many revisions, the parties negotiated change order No. 6, dated July 18, 1977, which provided that work during the shutdown period would be performed on a premium time basis, at an additional cost to CCA. The change order had the effect of reducing the shutdown period from 64 days to 54 days and increasing the cost of the contract work by $595,473. This figure was to cover the costs of performing all remaining work under the basic contract, all work requests and change orders through and including work request No. 88, and "those changes revealed in the Workshop Sessions . . . and meetings through June 28, 1977, for which work orders may not have been processed, but for which the scope of work is known."[9]

Change order No. 6 provided that the shutdown period would start September 7, 1977, and last 54 days until November 1, 1977. Both parties recognized the shutdown period was critical and that it was essential the work be completed within the allotted 54 days.

### (b) *The Shutdown*

For the first two weeks of the shutdown (primarily a demolition and preparation stage) everything went smoothly, with CNP actually operating ahead of schedule. But as soon as work began on the piping, it became apparent the final drawings issued by CCA still were inadequate. As many as 300 or more people were working for CNP on the project. As time was of the essence, there was no time for written change orders—it became "strictly oral." It became impossible for CNP to keep exact cost records for each of the hundreds of changes ordered by CCA.

Somehow, CNP was able to complete the shutdown phase on time; the plant actually produced paper by November 3. But many of the changes requested by CCA had a dynamic impact on successive phases of the planned construction during this period. As a result, there was a loss of productivity and substantial increases in costs to CNP for performing both the original contract work and the changed work. The majority of CNP's claim at trial involved the impact costs resulting from CNP's work during the shutdown period.

---

[9] This last clause amounts to an acknowledgement by CCA that changes in the work were being made orally, even before the critical shutdown period.

## E. *Retention*

The original construction agreement provided that CCA would retain 10 percent of CNP's monthly billing, to be released to CNP on successful completion and acceptance of the project. It was further provided that if, in CCA's opinion, CNP was performing satisfactorily, the amount retained would be reduced to 5 percent. (See fn. 6, *ante.*)

On September 14, 1977,[10] CCA informed CNP in writing that CCA would reduce the rate of retention from 10 to 5 percent in accordance with the contract, as CCA was satisfied with CNP's performance of the contract. But CCA did not follow through and pay CNP the approximate $500,000 in retained funds which were owed when the job was accepted on January 1, 1978. Instead, it paid $200,000 on October 31, 1978 (approximately 10 months late), and $300,000 on May 31, 1980, some 29 months after it was due and one week before commencement of trial.

## F. *Trial*

After 16 days of hearing, Justice Kane reported his findings and conclusions in favor of plaintiff to the trial court, and judgment was entered accordingly. The court concluded (1) that CCA had abandoned the contract of June 10, 1976; (2) that CCA had breached the contract of June 10, 1976; (3) that as a proximate result of CCA's breach and abandonment of the contract, the guaranteed maximum provisions of the contract were not applicable and CNP was therefore entitled to recover the reasonable costs of its work. Judgment was awarded plaintiff in the sum of $2,898,687.47, together with interest at the rate of 7 percent on the sum of $2,836,720.81 from November 28, 1978, the date of the complaint, through and including the date of satisfaction of judgment.[11]

---

[10]This was shortly after commencement of the shutdown period.

[11]Based on the findings of fact and conclusions of law, the award consists of the following components:

*CNP's Award*

| | |
|---|---:|
| Direct costs and/or reasonable value of services | $8,194,713.02 |
| Payments made | (−) 5,544,400.00 |
| Balance due—Direct costs | $2,650,313.02 |
| Less credits | (−) 50,876.59 |
| Balance due—Net direct costs | $2,599,436.43 |
| Reasonable overhead and profit at 6.68 percent | 173,642.35 |
| Principal owed to CNP | $2,773,078.78 |

*Judson's Award* (see fn. 1, *supra*)

| | |
|---|---:|
| Direct costs | $113,180.76 |
| Reasonable overhead and profit | 16,977.11 |
| Reasonable value of services | $130,157.87 |

## Discussion

### A. *Introduction*

The primary issues on appeal are whether the trial court properly found that either an abandonment of contract or breach of contract had occurred and, if so, whether damages in favor of CNP were properly computed. CCA further contends the referee erred when making certain of his proposed findings of fact. In its cross-appeal, CNP claims the court erred in not awarding CNP the costs of borrowing resulting from CCA's wrongful withholding of money due.

As there was substantial evidence that change orders and extra work imposed by the Owner upon the Contractor were of such magnitude as to change the scope of the work originally contemplated under the contract, the record supports the court's findings and conclusions that the parties had abandoned the original contract. The contractor was therefore entitled, under the factual circumstances of this case, to recover the reasonable value of the work it performed on a quantum meruit basis, without being limited by the original contract amount. We affirm the judgment.

### B. *Abandonment of the Construction Contract*

■ Appellant CCA's initial contention is that the trial court erred in finding that CCA had abandoned the contract of June 10, 1976. Further, appellant contends the court's findings that the contract had been both abandoned and breached were inherently inconsistent, thereby requiring reversal of the judgment. In so arguing, appellant states that completion of the contract is inconsistent with a holding that the contract was abandoned.

| | |
|---|---:|
| Payments made | (−) 66,965.84 |
| Principal owed to Judson | $ 63,192.03 |
| *Total Award* ($2,898,687.47) | |
| To CNP's account | $2,773,078.78 |
| To Judson's account | 63,192.03 |
| Total Principal | $2,836,270.81 |

*Plus* 7 percent interest on principal amounts to each from date of complaint (Nov. 8, 1978) to satisfaction of judgment.

In addition, CNP was awarded 7 percent interest on amounts unlawfully retained:

| | |
|---|---:|
| 7 percent of $200,000 (10 months) | $11,666.66 |
| 7 percent of $300,000 (29 months) | 50,750.00 |
| | $62,416.66 |

The total overall award was $2,898,687.47, plus 7 percent interest on the $2,836,270.81 amount.

Relying primarily on three cases specifically involving construction contracts (see *Daugherty Co.* v. *Kimberly-Clark Corp.* (1971) 14 Cal.App.3d 151 [92 Cal.Rptr. 120]; *Opdyke & Butler* v. *Silver* (1952) 111 Cal.App.2d 912 [245 P.2d 306]; *Dodge* v. *Harbor Boat Bldg. Co.* (1950) 99 Cal.App.2d 782 [222 P.2d 697]), respondent CNP argues that the findings and conclusions of the trial court were correct. We agree.

## 1. *Abandonment*

A fundamental fallacy in CCA's arguments is its reliance on traditional contract theories relating to abandonment or rescission as set forth in cases involving nonconstruction contracts. In these cases, abandonment may start with an intent to abandon by one or both of the contracting parties and conclude with an agreement by each that the contract is terminated and of no further force and effect. Using this analytical approach, completion of the contract would be inconsistent with a holding that a contract was abandoned.

In the specific context of construction contracts, however, it has been held that when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of contract properly may be found. (See *Daugherty Co.* v. *Kimberly-Clark Corp., supra,* 14 Cal.App.3d at p. 156; *Opdyke & Butler* v. *Silver, supra,* 111 Cal.App.2d at pp. 916-919.) In these cases, the contractor, with the full approval and expectation of the owner, may complete the project. (See *Daugherty Co.* v. *Kimberly-Clark Corp., supra,* 14 Cal.App.3d at pp. 156-157.) Although the *contract* may be abandoned, the *work* is not. Under this line of reasoning, the trial court was well justified in determining that, by their course of conduct, the parties had abandoned the terms of the written contract while proceeding to complete the mill restoration project.

In *Opdyke,* a contractor sued the owner for services performed in the remodeling of a building. The original written contract had a maximum limit as to cost and included detailed plans and specifications. Any changes were to be in writing. The controversy in *Opdyke* centered around whether, during the course of performance, this written agreement had been abandoned and an oral agreement substituted for it. From the start, the owner in *Opdyke* constantly changed his mind concerning the construction, and the completed project differed markedly from the original plans and specifications.

The appellate court enumerated 20 changes which materially increased the contractor's costs and caused performance of the work to be done under disadvantageous circumstances.

In this case there was evidence of hundreds of changes, many of them significant, resulting in extra work having to be performed by CNP. As in *Opdyke,* the requirement for written change orders was ignored during most of the project period, and it was completely abandoned during the critical shutdown stage. In language equally applicable here, the *Opdyke* court stated: "These changes began even before the work was started, and evinced a high degree of uncertainty on the part of [the owner] as to what he wanted done. They show the early adoption and consistent use of a policy of demanding changes and even reconstruction after portions of the work were completed. *This goes far toward supporting the soundness of the trial court's conclusion that the original contract was in fact abandoned.*" (*Opdyke & Butler* v. *Silver, supra,* 111 Cal.App.2d at p. 918, italics added.)

Factually, the dispute in *Daugherty* was similar to this one. It, too, involved the construction of a papermill. The original contract price in *Daugherty* was $2,933,610 but, due to changes by the owner, the total amount was increased by $1,617,629.21 to a total of $4,551,239.21. It was alleged that the papermill project in *Daugherty* had been "completely redesigned" after the contract was executed. An experienced manager stated he had never seen anything comparable to the changes ordered by the owner, the project was the most poorly engineered he had ever seen, and this resulted in the enormous change orders. (*Daugherty Co.* v. *Kimberly-Clark Corp., supra,* 14 Cal.App.3d at p. 155.) In reversing a summary judgment in favor of the property owner, the Court of Appeal concluded that due to the numerous changes, a triable issue existed "as to whether the contract had been abandoned by the parties and they proceeded apart from the contract." (*Id.,* at p. 156.)

Referring to the earlier *Opdyke* case, the *Daugherty* court stated: "Abandonment of a contract may be implied from the acts of the parties. . . . Abandonment of the contract can occur in instances where the scope of the work when undertaken greatly exceeds that called for under the contract. In *Opdyke* the written contract provided that all change orders should be approved by the architect, should be in writing and the contract should be adjusted accordingly before the work was done. Yet, because the parties consistently ignored this requirement in material part, the court allowed a recovery on quantum meruit." (*Daugherty Co.* v. *Kimberly-Clark Corp., supra,* 14 Cal.App.3d at p. 156.)

In this case the extra costs incurred by CNP were actually greater, both in absolute terms and on a percentage basis, than in *Daugherty*. By the time the Santa Clara project had ended, CNP had expended $8,194,713.02 in direct labor and material costs, not including profit or overhead. This was $3,405,713.02 more than the original contract amount of $4,789,000. There was also expert testimony by a consultant who had participated in over 250 construction disputes in behalf of both owners and contractors. In his experience, he had never been exposed to a situation where there had developed a need for prolonged drawing reviews such as were held in this case. Further, among projects put out to competitive bid, he had never seen one that required as much redesign work as did this one. The court found that CCA had expended a total of 16,414 hours of redesign time on the project after CNP began its work,[12] the project was poorly engineered, and there were an extensive number of changes which were beyond the contemplation of the parties when the contract was first executed. Many of these changes were made without following the procedures provided for in the written contract. We conclude the trial court in this case properly found the contract had been abandoned.

## 2. *Inconsistent Findings*

In its findings of fact and conclusions of law, the trial court stated: "1. Defendant abandoned the contract of June 10, 1976. [¶] 2. Defendant breached the contract of June 10, 1976."

Appellant CCA contends the California courts have consistently recognized the incompatibility of abandonment and breach, and therefore the trial court erred when rendering its judgment based upon those inconsistent findings. Again, appellant relies primarily on nonconstruction contract cases which, in addition, specifically concern rescission rather than abandonment of contracts. (See, e.g., *Paularena* v. *Superior Court* (1965) 231 Cal.App.2d 906, 915 [42 Cal.Rptr. 366]; *Jozovich* v. *Central California Berry Growers Assn.* (1960) 183 Cal.App.2d 216 [6 Cal.Rptr. 617].)

In rescission cases the Civil Code now prescribes the method by which *one* party may unilaterally rescind the contract on explicit notice to the

---

[12]Although appellant challenges the number of hours of actual "redesign" time found by the court, there can be little question the amount of time spent by IMC on redesign work was substantial. (See *infra*.)

other. (See Civ. Code, § 1691.) In contrast, abandonment requires a finding that *both* parties intended to disregard the contract, and abandonment may be implied from the acts of the parties. (*Daugherty Co.* v. *Kimberly-Clark Corp., supra,* 14 Cal.App.3d at p. 156; *Opdyke & Butler* v. *Silver, supra,* 111 Cal.App.2d at p. 916.)

Further, the cases cited by appellant seem primarily concerned with preventing a plaintiff from receiving a *double recovery* by obtaining both restitution through rescission and additional damages by alleging a breach of contract. (*Paularena* v. *Superior Court, supra,* 231 Cal.App.2d 906 [damages may not be recovered on theory contract exists and additionally on theory contract has ended]; *Jozovich* v. *Central California Berry Growers Assn., supra,* 183 Cal.App.2d 216 [recovery of damages on one count; restitution awarded on second count; restitution set aside].) In this regard, while Civil Code section 1692 provides that a *claim* for damages is not inconsistent with a *claim* for relief based upon rescission, the complete relief contemplated under that section may not include duplicate or inconsistent items of *recovery.* (Civ. Code, § 1692.) Appellant in this case has not asserted that CNP received a double recovery as a result of the trial court's judgment.

■ In support of the trial court's conclusion that CCA both breached and abandoned the contract, CNP contends the evidence indicates CCA had breached its contract with CNP in at least three material ways. First, CCA had failed to inform CNP that it would substantially reengineer and redesign the papermill while CNP was working on the project. By failing to impart its knowledge of difficulties to be encountered in a project, an owner may be liable for misrepresentation if the contractor is unable to perform according to the contract provisions. (*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996].) Second, CCA breached its contract by providing CNP with plans that were both erroneous and extremely late in issuance. Although construction started on May 1, 1976, lengthy drawing reviews became necessary and final drawings were still being furnished as late as July through September 1977. The furnishing of misleading plans and specifications by an owner is a breach of an implied warranty of their correctness. (*Souza & McCue Constr. Co.* v. *Superior Court* (1962) 57 Cal.2d 508, 510-511 [20 Cal.Rptr. 634, 370 P.2d 338].) Finally, CNP contends the contract was breached when payments of the $500,000 retention money were delayed for 10 to 29 months after they were due.

■ We agree with respondent that rather than being inconsistent with abandonment, these and other breaches by CCA were actually the precipi-

tating cause for the construction contract being abandoned within the meaning of *Daugherty* and *Opdyke* and the subsequent implicit understanding by the parties to proceed with the project on a quantum meruit basis. So long as there was no double recovery based on the trial court's dual findings, we conclude the trial court could properly find both a breach of the contract and a subsequent abandonment of the contract brought about by the breach.

## C. *Damages*

### 1. *Introduction*

In determining the amount of CNP's award in this case, the trial court based its award on CNP's total costs.[13] Regarding damages, the court concluded:

"3. As a proximate result of the Defendant's breach and abandonment of the contract, the guaranteed maximum provisions of the contract are not applicable and Plaintiff is entitled to recover the unpaid reasonable costs of its work.

". . . . . . . . . . . . . . . . . . . . . . . .

"5. As a proximate result of Defendant's breach and abandonment of the contract, Plaintiff has been damaged and is entitled to recover from Defendant the sum of $2,898,687.47, plus interest at 7 percent on the sum of $2,836,720.81, from the date of the Complaint (which includes 7 percent for Judson on its claim of $63,192.03)."

Appellant CCA contends the use of the total cost approach was erroneous as it was contrary to the terms of the contract, it is a method disfavored by the courts, and it ignores CNP's own deficiencies in its performance.

### 2. *Recovery on Quantum Meruit*

When executed, the contract maximum was $4,789,000, plus a $300,000 fee. Pursuant to change order provisions, this amount was later

---

[13]The court found, in part: "62. The Plaintiff has expended, in direct labor and material costs, the sum of $8,194,713.02 in performing all the work under this contract.

"63. The total reasonable value of Plaintiff's services in performing such work is $8,194,713.02.

"64. The Defendant to date has paid Plaintiff $5,544.400.

"65. The balance due the Plaintiff for direct labor and material costs is $2,650,313.02, less $50,876.59 for credit items, which balance is $2,599,436.43." (See also, *ante,* fn. 11.) In addition, CNP was awarded $63,192.03 in behalf of its subcontractor, Judson, on a similar basis.

revised upwards to $5,937,114. (See fn. 3, *ante.*) The trial court found that CNP's expenditures and the reasonable value of its services was $8,194,713.02, and based its award on the latter figure. Appellant's initial argument is that awarding damages based on total costs runs contrary to the terms of the contract.

But once is it found that the terms of a construction contract have been abandoned, the contractor who completes the project is entitled to recover the reasonable value of its services on a quantum meruit basis. For example, in *Dodge* v. *Harbor Boat Bldg. Co., supra,* 99 Cal.App.2d 782, a Navy contract to "mothball" a vessel resulted in cost overruns because the Navy consistently changed its requirements. The original specifications were altered and supplemented so extensively as to make it impossible for the trial court to segregate the work originally agreed to from the total work required to complete the job to the satisfaction of the Navy. The Court of Appeal concluded "there was a sufficient departure from the original specifications to render it appropriate to use the value of [the sub-contractor's] entire work as a proper basis for fixing its compensation." (*Id.,* at pp. 790-791.)

In *Opdyke,* after finding the contract had been abandoned because the owner's many changes had caused increased costs to the contractor, the court stated it would be unfair to then permit the owner to plead the maximum price provision which he had himself made inapplicable and unjust. (*Opdyke & Butler* v. *Silver, supra,* 111 Cal.App.2d at p. 919.) The Court of Appeal concluded "that the trial court was well justified in determining that, *by the course of conduct which the parties adopted, they abandoned the price limitation and proceeded upon a straight cost plus basis.*" (*Ibid.,* italics added.)

When discussing *Opdyke,* the *Daugherty* court noted that the written contract in *Opdyke* provided that all change orders should be approved by the architect and be in writing. "Yet, because the parties consistently ignored this requirement in material part, the court allowed a recovery on quantum meruit." (*Daugherty Co.* v. *Kimberly-Clark Corp., supra,* 14 Cal.App.3d at p. 156.) In *Daugherty* itself, the court reversed a summary judgment in behalf of the owner, permitting the plaintiff contractor to seek at trial the reasonable value of supplies, materials and labor furnished. (*Id.,* at pp. 154, 156-157, 158-159.)

In this case, the trial court found: "The many changes ordered by the Defendant during the shutdown severely impacted Plaintiff's planned construction operation, caused a loss of productivity, and resulted in increased costs for performing of both the contract work and the changed work."

There was substantial evidence to support that finding. Due to the owner's breach and abandonment of the contract, the trial court concluded "the guaranteed maximum provisions of the contract are not applicable and [CNP] is entitled to recover the unpaid reasonable costs of its work." We hold that the trial court's conclusion was a proper one.

### 3. *Basing Damages on Total Costs*

■ In support of its contention that the total cost method is disfavored by the courts, appellant relies primarily on *Huber, Hunt & Nichols, Inc.* v. *Moore* (1977) 67 Cal.App.3d 278 [136 Cal.Rptr. 603] and *Boyajian* v. *United States* (Ct. Cl. 1970) 423 F.2d 1231. In *Huber,* the plaintiff contractor, seeking damages from an architect for negligent preparation of plans and specifications, sought to collect the difference between its initial bid estimate and the total cost of the project. The trial court refused to let the contractor use this total cost approach, relying on the court of claims decision in *Boyajian.* In each case, the contractor was unable to provide specific evidence of causation, first by showing ordinary costs and then by showing the increased costs brought about by the alleged breach. "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach. 'The costs must be tied in to fault on defendant's part.' [Citation.]" (*Boyajian* v. *United States, supra,* 423 F.2d at p. 1235, quoted in *Huber, Hunt & Nichols, Inc.* v. *Moore, supra,* 67 Cal.App.3d at p. 308, fn. 22.) Nor was there " 'any satisfactory explanation given as to why such an attempt was not made or why it would not have produced reasonably accurate results.' " (*Ibid.;* see also *Huber, Hunt & Nichols, Inc.* v. *Moore, supra,* 67 Cal.App.3d at p. 309.)

In this case, CNP was unable to keep more accurate cost records due to fault on the part of CCA. The trial court made specific findings, supported by the record, that due to the many errors and omissions in the drawings furnished by CCA, the latter orally instructed CNP to perform numerous changes during the critical shutdown period. The work caused by these changes was complex, and the trial court found it was impossible for CNP to keep accurate cost records for each and every change during the shutdown. Thus, unlike in *Boyajian* v. *United States, supra,* at p. 1235, or *Huber, Hunt & Nichols, Inc.* v. *Moore, supra,* at p. 310, the owner's conduct prevented CNP from making a more detailed showing as to how the damages claimed were caused by the breach. Although the total cost theory of proving damages in a contract case is not generally favored, under proper safeguards and where there is no better proof it has been upheld. (*H. John Homan Co.* v. *United States* (Ct. Cl. 1969) 418 F.2d 522, 528; *J.D. Hedin*

*Construction Company* v. *United States* (Ct. Cl. 1965) 347 F.2d 235, 246-247.) Under the facts of this case, it was appropriate for the trial court to award damages based on the total cost method.

### 4. *Other Contentions*

Appellant argues that it presented evidence by its architect to show that the additional costs for which it was liable was $500,178, and that if CNP was dissatisfied with CCA's cost analysis, it should have presented evidence on why this analysis was incorrect. CCA misconstrues the respective burdens of the parties at trial. "Once the plaintiff has established the amount which he has been induced to expend, the defendant must show that the expenses of the party injured have been extravagant and unnecessary for the purpose of carrying out the contract." (*Mendoyoma, Inc.* v. *County of Mendocino* (1970) 8 Cal.App.3d 873, 879 [87 Cal.Rptr. 740].)

Appellant CCA also argues that the trial court, in making its award based on total costs, ignored evidence that CNP was itself responsible for some of the increased costs. In so arguing, appellant asks this court to reweigh evidence previously weighed and evaluated by the trial court. This we refuse to do.

The trial court's damage award was supported by substantial evidence and was appropriate under the facts of this case.

### D. *Findings of Fact*

Appellant raises a series of contentions regarding the trial court's findings of fact. First, CCA claims the trial court erred in failing to find on a material issue of fact. As its second affirmative defense, CCA had alleged negligence by CNP in performing the contract, and points to certain evidence from which it argues that CNP could be found negligent for some of the cost overruns.

In response, CNP argues the ultimate fact in determining damages was not whether CNP was negligent but, once having found the contract was abandoned entitling CNP to recover its costs, whether those costs were reasonable. CNP contends that finding Nos. 62 and 63,[14] when read together, show definitively that CNP's total costs were reasonable and necessarily incurred, and therefore were not the result of contractor negligence. CNP concludes that no further findings on this issue were necessary.

---

[14] See footnote 13, *ante.*

At the time of trial,[15] it was settled law in California that findings were required on all material issues presented by the pleadings and the evidence, including issues raised upon affirmative defenses set up in the answer. (*J. T. Jenkins Co.* v. *Kennedy* (1975) 45 Cal.App.3d 474, 482 [119 Cal.Rptr. 578].) It is true, as appellant argues, that there was no express finding that respondent CNP was or was not itself negligent in its performance under the contract.

But the trial court did make several express findings, each supported by the evidence, regarding delays, errors and omissions by CCA in the preparation of necessary drawings (see, e.g., finding Nos. 13, 23, 25, 26, 28, 40, 47, 50); CNP's reliance on the timely delivery of the promised drawings (finding No. 27); revisions in detail sheets that were due to changes by CCA and "not due to any mistake or fault" of CNP or its subcontractor, Judson (finding No. 32); the unusual nature of the drawing reviews (finding No. 39); the "unreasonable" redesign time and the project being "poorly engineered" by CCA and its engineer, causing an excessive number of changes beyond the contemplation of the parties when the contract was executed (finding Nos. 43, 44, 45); and "the complexity of the work caused by [CCA's] many changes being performed during the shutdown, [making it] impossible for [CNP] to keep accurate cost records for each and every change that was made during the shutdown" (finding No. 56). Significantly, the court found that CCA, acting pursuant to the construction agreement (see fn. 6, *ante*), notified CNP in writing on September 14, 1977 (shortly after commencement of the shutdown period), that CNP was satisfactorily performing the contract through that date, and CCA would reduce its rate of retention from 10 percent to 5 percent. (See finding Nos. 24, 52.)

Based on the express findings that were made, it is possible to not only conclude that CCA or its agents were responsible for the extensive costs overruns but to also imply a finding that appellant's affirmative defense that CNP had negligently performed the contract was nonmeritorious. (See *Edgar* v. *Hitch* (1956) 46 Cal.2d 309, 312-313 [294 P.2d 3].) As the evidence was such that the findings actually made are enough to support the judgment, the failure to find on the issue of CNP's alleged negligence is not prejudicial.

Turning to other alleged errors in the findings, to the extent there may have been errors, they were either on matters which were immaterial, or of

---

[15]In 1981, the Legislature abolished the requirement of findings and conclusions, and substituted a different method involving the use of a statement of decision to explain the factual and legal basis for a trial court's decision on each requested controverted issue at trial. (See Code Civ. Proc., § 632, as amended by Stats. 1981, ch. 900, § 1.)

so little materiality or unnecessary to the judgment rendered that a finding either way on the matter would not have influenced the judgment. Other findings being sufficient to support the judgment, any error as to these likewise would be harmless. (See *American National Bank* v. *Donnellan* (1915) 170 Cal. 9, 15 [148 P. 188]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 307, pp. 4288-4299.)

For example, appellant complains of findings relating to the exact amount of "redesign" time agreed to and provided by the architect to CCA. In addition to an original sum of $213,375, CCA and IMC contracted for an additional $200,258 worth of architectural services, provided that if IMC expended "in excess of 3680 hours in redesign activities associated with corrections," IMC would receive additional compensation. IMC actually spent 16,414 additional hours on the overall plant modernization, with the only dispute being how much of the additional 12,734 hours was in "redesign" time, and how much was spent in "new projects." CNP relied on billings from the architect, IMC, to CCA that all of these hours were for "redesign activities." The strongest evidence CCA cites is testimony that "the majority" of an estimated 10,000 additional hours "was not redesign work." This still leaves open the conclusion that the balance of the 16,414 hours, perhaps in excess of 11,000 hours, *was* "an unreasonable amount of redesign time expended after Plaintiff had commenced work and was beyond the contemplation of the parties at the time of the execution of the contract." (See finding No. 44.) Presumably it was within the power of CCA to provide a more accurate accounting of just how many of IMC's actual total of 16,414 hours was spent on "new projects" and how much on "redesign." Significantly, they did not do so. (See Evid. Code, § 412.) While the record justified the court's actual finding, assuming there was any error in the precise number of hours spent on "redesign" work, we conclude that any possible variations would be immaterial to the judgment actually entered.

Appellant's other contentions regarding the findings are without merit.

### CNP's Cross-appeal

In its cross-appeal, CNP argues that the trial court erred in not awarding it the costs of borrowing resulting from CCA's wrongful withholding of money due.

At trial, CNP had requested the trial court to consider the effects of inflation with respect to any award as well as the costs of borrowing money. In its award, CNP recovered its unreimbursed costs, plus 6.68 percent to cover overhead and profit. In addition, the trial court awarded interest at the rate

of 7 percent on the retention money from the date of project completion, and 7 percent on the judgment from the date the complaint was filed. (See fn. 11, *ante.*) In its notice of intended decision, however, the court stated: "No allowance is being made for inflation. This is a factor which, in the commercial world, must be limited to cases in which the parties have *expressly* agreed that it may be included as an element of damage; or, in the alternative, it is a matter for the Legislature to decide prospectively."

We agree with the trial court. We are aware of no California contract case in which damages were awarded to compensate for the effects of inflation or the costs of borrowing money. To the extent that recognition has been given to these factors, the issue has arisen in the context of tort cases wherein the purposes and calculation of damages differ from those in contract disputes. (*Hunt Bros. Co.* v. *San Lorenzo etc. Co.* (1906) 150 Cal. 51, 56 [87 P. 1093]; see, e.g., *Rovetti* v. *City and County of San Francisco* (1982) 131 Cal.App.3d 973 [183 Cal.Rptr. 1] [leak in sewage line]; *Dean W. Knight & Sons, Inc.* v. *First Western Bank & Trust Co.* (1978) 84 Cal.App.3d 560, 569 [148 Cal.Rptr. 767] [fraud]; *Camrosa County Water Dist.* v. *Southwest Welding & Mfg. Co.* (1975) 49 Cal.App.3d 951 [123 Cal.Rptr. 93] [breach of warranty]; *Leslie Salt Co.* v. *St. Paul Mercury Ins. Co.* (9th Cir. 1981) 637 F.2d 657, 661 [insurer's duty of good faith; California law applied].) After examining the record, we do not feel the evidence as to what amounts CNP actually borrowed was sufficiently developed that we should consider extending this tort rule to contract disputes in this appeal. Further, the recent case of *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790 [214 Cal.Rptr. 904, 700 P.2d 794], brought to our attention by CNP, concerned the "just compensation" to be paid by a public agency when it condemns private property, and is inapplicable to this dispute between private entities.

At the federal level, until 1978, interest was not allowed on contract claims against the United States unless the contract or an act of Congress provided for its payment. Under the Contract Disputes Act of 1978 (41 U.S.C. § 601 et seq.), federal contractors may now recover interest on their contract claims (see 41 U.S.C. § 611). In this regard, Congress has indicated that the cost of money to finance a contractor's additional work while pursuing its legal remedy is a legitimate cost of performing the additional work, and is recoverable under that act. (see 1978 U.S. Code Cong. & Admin. News, at p. 5266.) We have not been made aware of any similar statute in California that might apply to this case.

As there is no such duty imposed by law, and the parties did not expressly so agree in their original contract, the trial court correctly ruled in not

awarding CNP the costs of borrowing money resulting from CCA's wrongful withholding.

In a supplemental brief, CNP argues that even if they are limited to the legal rate of interest, the legal rate of postjudgment interest was statutorily increased from 7 percent to 10 percent after the judgment below was entered on October 1, 1981. (Code Civ. Proc., § 685.010.) This increased rate of interest applies on and after January 1, 1983, even as to outstanding judgments entered before that date. (*American National Bank* v. *Peacock* (1985) 165 Cal.App.3d 1206, 1210 [212 Cal.Rptr. 97].) Thus, the postjudgment interest should be computed at the rate of 7 percent per annum on the unsatisfied judgment from October 1, 1981, to December 31, 1982, and 10 percent thereafter.

The original judgment against defendant CCA, combining both prejudgment and postjudgment interest, was "in the sum of $2,898,687.47, together with interest at the rate of seven percent on the sum of $2,836,720.81 from the date of the Complaint, November 28, 1978, to and including the date of satisfaction of judgment." The increased interest rate may be implemented by modifying the last clause, to read: ". . . to and including December 31, 1982, and at the rate of ten percent on any unsatisfied sum from January 1, 1983 to and including the date of satisfaction of judgment."

It is directed that CNP be awarded costs arising from the original appeal by CCA and on its cross-appeal. The judgment is modified as stated above and, as modified, the judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

On October 22, 1985, the judgment was modified to read as printed above.